STATE OF SOUTH DAKOTA, Respondent, v. PICKUS, Appellant.

(257 N. W. 284.)

(File No. 7500. Opinion filed November 15, 1934.)

*Williamson, Smith & Williamson, E. B. Harkin,* and *F. W. Noll,* all of Aberdeen, for Appellant.

*Walter Conway,* Attorney General, *James Brown,* Assistant Attorney General, *H. O. Hepperle,* of Aberdeen, and *P. C. Morrison,* of Mobridge, for the State.

CAMPBELL, J. Defendant was a partner in a firm known as H. Pickus Construction Company which had built a number of bridges for Brown County. An indictment was returned against him on September 3, 1931, in six counts, each count having rela-

tion to a different bridge. Count 1 alleges the contract for the construction of a certain bridge, concrete to be paid for at the rate of $23 per cubic yard, and structural steel at the rate of 4¾ cents per pound. That defendant on October 3, 1928, "designedly and with intent to cheat and defraud the said county of Brown * * * did present * * * a final account and verified claim in writing * * * in which the said Herman Pickus did falsely and fraudulently represent and state" that there was used in the construction of said bridge a certain amount of concrete and a certain amount of structural steel "whereas in truth and in fact, as said Herman Pickus at said time well knew," there was used a lesser amount of concrete and a lesser amount of steel. That the county commissioners of said county, "believing that said verified claim was just and true and relying thereon, allowed the said claim" and caused to be paid to the construction company $714.59 more than was due for the construction of the bridge, "and the said Herman Pickus thereby procured and obtained for the said H. Pickus Construction Company from the said Brown county * * * the sum of $714.59 by false pretenses of said Herman Pickus contrary to the form of the statute in each case made and provided," etc. Count 2 is similar, alleging with reference to a second bridge the securing of an excess payment of $1,165.39 by false final account and claim filed November 7, 1928. Count 3 referring to a third bridge alleges the securing of an excess payment of $583.13 by false final account and claim filed September 4, 1928. Count 4 referring to a fourth bridge alleges the securing of an excess payment of $574.10 by false final account and claim filed August 6, 1928. Count 5 referring to a fifth bridge alleges the securing of an excess payment of $810.42 by false final account and claim filed August 6, 1928. County 6 referring to a sixth bridge alleges the securing of an excess payment of $1,433.00 by false final account and claim filed December 3, 1929.

Defendant's motion to quash and set aside the indictment having been denied, and his demurrer thereto having been overruled, the case proceeded to trial upon his plea of not guilty.

At the close of all the testimony, the court advised a verdict upon counts 4 and 5 because the crimes therein charged, if in fact they had been committed at all, had been committed more than three years prior to the filing of the indictment, but instructed the

jury that the evidence relating to those counts might be taken into consideration by the jury with all the evidence in the case as going to the question of the design or knowledge of the defendant in determining his guilt or innocence on the other four counts. In submitting the four remaining counts to the jury, the only instructions given by the court specifically relating to the offense of obtaining money by false pretenses were the following:

"Under the law of this state, every person who, designedly, by color or aid of any false token, writing or other false pretense, obtains from any person, (which would include the county), any money or property, is guilty of obtaining money or property under false pretenses.

"The three principal elements involved in the crime of obtaining money by false pretenses are, first, that the money must have been obtained by means of a false writing or other false pretense, second, that the money must have been parted with by the person who paid it out in this case the county under the belief that the false writing or false pretense was in fact true, and in reliance thereon, and third, that the defendant at the time he presented the false writing or made the false pretense and at the time he received the money knew that the writing or other pretense was false. Each and every one of these elements must be established by the evidence in the case beyond a reasonable doubt before the crime is established.

"The Court further instructs the jury that pretense in any of the counts of this indictment could not be designedly false, without at the same time, being knowingly false, and in order to find the defendant guilty of the charges contained in any of the Counts of this Indictment, it is necessary for the jury to find, beyond a reasonable doubt, that the defendant knew such pretenses were, in fact false, at the time he made them. If the accused honestly believed in the truth of the representation made although it may have been false, the offense is not committed. But making a statement that is in fact false recklessly without information to justify a belief in its truth is equivalent to making a statement knowing it to be false."

As to counts 4 and 5 the only forms of verdict given to the jury were "not guilty." As to counts 1, 2, 3, and 6, the court gave to the jury two forms of verdict applicable to each count,

which may be exemplified by the forms submitted in relation to count 1; those on the others counts being identical excepting for the number of the count. Such forms, omitting the title of the case, were as follows:

"We, the Jury in the above entitled cause find the defendant Herman Pickus guilty of obtaining money by means of false pretenses as charged in Count One of the information and we find that the amount of money of which the County was thereby defrauded was the sum of $————.

"Dated this ———— day of March, 1932.

"————————————

"Foreman.

"We, the Jury in the above entitled cause find the defendant not guilty on Count One.

"Dated this ———— day of March, 1932.

"————————————

"Foreman."

The court further instructed the jury as to counts 1, 2, 3, and 6, that, if they should find the defendant guilty on any of said counts, they should determine and insert in the verdict in the blank space therefor the amount of money of which the county was defrauded by the false pretense embraced in that particular count.

The jury duly returned the verdicts of "not guilty" on counts 1, 3, 4, 5, and 6. As to count 2, the jury made use of the form provided by the court for a verdict of guilty, but, in addition to filling the blank left to indicate the amount of money of which the county was defrauded (which blank they filled by inserting the figures 2,000), the jury also inserted between the words "money" and "by" in the second line the words "recklessly without information to justify truthfully, did obtain," so that the verdict of the jury duly dated and signed by the foreman and returned with reference to count 2 of the information read as follows:

"We, the Jury in the above entitled cause find the defendant Herman Pickus guilty of obtaining money recklessly without information to justify truthfully, did obtain by means of false pretenses as charged in, Count Two of the information and we find that the amount of money of which the County was thereby defrauded was the sum of $2,000.00."

Thereafter the defendant moved the court to enter judgment discharging the defendant upon the verdict returned by the jury on count 2 and moved in arrest of judgment thereon upon the following grounds, among others:

"That the verdict of the jury is defective and unintelligible and is insufficient in form and substance and is not sufficient upon which to base a judgment of the Court; that said verdict is neither general nor special, does not find the defendant guilty of any felony under the statutes of the State of South Dakota, and is indefinite and wholly omits the elements of the crime of obtaining property by false pretenses; that said verdict omits the finding on the essential element of the crime of false pretenses, to-wit: the element of 'design,' and is not responsive to the issues as made up of the Indictment and the plea of 'not guilty.'

"That the verdict so negatives essential elements of the crime of obtaining money by false pretenses, as defined by the statutes of South Dakota, as to constitute a finding of innocence when measured by the statutes and the record in said cause as a whole, and the Court is bound under the law to enter a judgment finding the defendant 'not guilty' and to discharge said defendant from custody."

Both motions were denied, and the court proceeded to enter judgment upon the verdict returned by the jury with reference to count 2, sentencing the defendant to the term of three years in the penitentiary and imposing upon him a fine in the sum of $6,000, together with costs, from which judgment and from the denial of his application for a new trial, defendant has here appealed.

Appellant first predicates error on the denial of his motion to quash and the overruling of his demurrer, by which proceedings in the court below he challenged the legality of the grand jury and the sufficiency of the indictment against him. We adopt for the purposes of this opinion the statement of facts relating to the drawing, summoning, and impaneling of the grand jury, which is set forth in appellant's brief in the following language:

"No order of any character for the calling of a grand jury was made prior to the convening of the regular May, 1931, term of court. No grand jury was called, summoned, or subpoenaed prior to the opening of said term. There was on file in the office of the clerk, prior to said term, the regular jury list containing

200 names of jurors of Brown county. From this list regularly, prior to the term, a petit jury of 48 jurors was ordered and summoned, appeared and served during said term until July 28th. All jury cases, both civil and criminal, being then completed, the jury was on that date discharged. The May, 1931, term adjourned October 6, 1931.

"On July 28, 1931, the regular jury list for that term being still on file in the office of the clerk, the court conducted a purported investigation of said jury list. He found that said jury list contained the names of 27 persons who were disqualified or ineligible to serve as jurors. These 27 disqualified names, together with the 48 names of jurors who had served for the term and had been discharged, made a total of 75, which, deducted from the 200 names originally upon the list at the beginning of the term, left 125 qualified jurors still upon said list. However, upon said July 28, 1931, the court made an order canceling said jury list and ordered the county commissioners to prepare a new list of 200 jurors. The old jury list remained in the physical possession of the clerk, each name, however, being marked 'canceled.' On July 31st a new list was prepared by the county commissioners and filed with the clerk on August 1, 1931. The commissioners who prepared this list had for many months been employing accountants, investigators, and engineers to investigate the bridges referred to in this indictment, together with other matters, and are the same county commissioners who spent large sums of money to employ special prosecutors for this case. The names of the jurors upon regular jury list which contained the names of 125 qualified jurors was removed from the ballot box.

"On August 3, 1931, the court made its purported order for summoning a grand jury. This purported order was neither attested nor sealed with the seal of the court. It was directed to the *clerk,* requiring *him* to *summon* jurors to be drawn for service during said May term and to appear on August 27, 1931.

"On August 3, 1931, the clerk notified the auditor, treasurer, and sheriff in writing of a meeting to be held for the purpose of drawing grand jurors. This notice did not contain the mandatory provision of the statute that they be notified to draw a jury 'for the next term of the circuit court.' Instead, it contained the words *'at a term of said circuit court'* and specified a day during the May

term thereof. On the same day the treasurer, sheriff, auditor, and clerk drew from the new list of 200 jurors just furnished by the county commissioners, the names of 8 persons to serve as grand jurors. These jurors were summoned by the clerk, not by the sheriff. Subsequently 3 of the 8 drawn were excused and the court ordered the sheriff to summon from the body of the county 3 persons to fill their places. Subsequently, 1 of these 3 jurors failed to appear and the court ordered the sheriff to summon one other juror, which was done.

"The names of none of the 8 jurors thus secured were upon the original jury list on file at the commencement of the term and canceled on July 28th. Neither were they the first 8 persons whose names were drawn from the regular jury list for said term."

From these facts, appellant argues the illegality of the grand jury and consequent invalidity of the indictment, his contentions being summarized in his brief as follows:

"The indictment was illegal and void for the reason that it was not returned by a grand jury duly and legally constituted or drawn or impanelled according to law or pursuant to the notice required by law in the following respects:

"1. There was no effective order authorizing the drawing or summoning of a grand jury.

"2. The purported order was wholly without authority of law in that it was directed to the *clerk* requiring him to *summon* a jury to be *drawn,* instead of being directed to the *sheriff* requiring him to *summon* such jury from the body of the county.

"3. The grand jury was not summoned from the body of the county by the sheriff under special venire of the court, which is the only legal method of summoning a grand jury during term time.

"4. Even under the provisions of the statute for the drawing of a grand jury *before term time* the proceedings in this case were illegal and void for the following reasons:

"(a) The so-called grand jury was not drawn from the legal jury list.

"(b) The notice from the clerk to the auditor, treasurer and sheriff did not contain a mandatory provision that they were to convene to draw a jury 'for the next term of the Circuit Court.'

"(c) The so-called 'grand jury' was not composed of the first eight jurors drawn for service at the May term.

"5. Fundamental defects in the method of constituting, impanelling and notifying the so-called grand jury rendered it wholly illegal regardless of the grounds of challenge, and the indictment returned by it was void and subject to jurisdictional objections at any stage of the proceeding."

That the objections thus urged to this grand jury present some serious questions must be conceded and this court has not been able, after extended consideration, to arrive at complete agreement thereon. A majority of the judges, however, have come to the conclusion that the indictment is good. Extended discussion of the matter would not be particularly profitable. We therefore epitomize our determination with reference to it as follows:

 Every court is (and we think should be) extremely reluctant to reverse a conviction in a criminal case merely because of some flaw or defect in the accusatory procedure. The grounds for challenge to the panel of the grand jury are set forth in section 4660, R. C. 1919, which reads as follows:

"A challenge to the panel may be interposed by either party for one or more of the following causes only:

"1. That the requisite number of ballots was not drawn from the jury box of the county.

"2. That notice of the drawing of the grand jury was not given.

"3. That the drawing was not had in the presence of the officers designated by law, or in the manner prescribed by law."

By subdivision 4 of section 4762, R. C. 1919, it is provided, when the defendant was not held to answer before the finding of the indictment (and he was not so held in the instant case), that the indictment "must be set aside" upon defendant's motion on any ground which would have been good ground for challenge either to the panel or to any individual grand juror. As to defects in the formation of the grand jury specifically made ground for challenge, it is the established rule of this court that a defendant properly urging such defects has a constitutional right to have the indictment quashed regardless of actual prejudice. State v. Johnson (1926) 50 S. D. 388, 210 N. W. 350. We think, however,

that the statutes above cited limit the objections which a defendant will be heard to make to the formation of a grand jury to the defects specified in the challenge statute save for two possible exceptions; the first being a case where defendant can establish clearly and affirmatively that some other failure to comply with the statutory procedure with reference to the formation of a grand jury was actually prejudicial to him; and the second being the case where the noncompliance with the statutory requirements for the formation of a grand jury was of such nature or was so extensive that it must be said that the resulting body was not in any proper sense of the words a grand jury at all—that it was merely, in the language of the cases, "a body of persons assuming to act as a grand jury without semblance of legal authority." It is our opinion that the objections urged by appellant in this case do not fall within the ambit of the statute specifying the defects which constitute ground for challenge; that appellant has failed affirmatively to establish actual prejudice arising from any of the procedure to which he objects; and that the grand jury in this case was at least a purported grand jury and did act with at least a semblance of legal authority. We think therefore that this body was competent to return an indictment. As tending either directly or indirectly to support the views above indicated, we cite the following cases: State v. Shanley (1905) 20 S. D. 18, 104 N. W. 522; State v. Lamphere (1905) 20 S.D. 98, 104 N.W. 1038; State v. Forgraves (1913) 32 S. D. 21, 141 N. W. 990; State v. Hanson (1928) 53 S. D. 205, 220 N. W. 518; People v. Southwell (1873) 46 Cal. 141; State v. Longstreth (1909) 19 N. D. 268, 121 N. W. 1114, Ann. Cas. 1912D, 1317; State v. Walla (1929) 57 N. D. 726, 224 N. W. 211; People v. Lay (1916) 193 Mich. 17, 159 N. W. 299, L. R. A. 1917B, 608. Cf. also 12 R. C. L. 1027; 31 C. J. pp. 804, 805.

We proceed next to consider the objections urged to the court's instructions to the jury in this case. The crime of unlawfully obtaining property by cheats, or false tokens, or false pretenses was known to the old common law prior to the enactment of any statutes concerning it. Statutes relating to the offense have existed in England since 33 Hen. 8, c. 1 (1542) and exist throughout the United States today. Our own statute on the subject is section 4249, R. C. 1919. It originated as section 623 of the

Penal Code passed by the Fourth Territorial Legislature of Dakota (title 14, c. 7, Laws Dakota 1864-65), which reads as follows:

"Every person who, with intent to cheat or defraud another, designedly, by color or aid of any false token or writing, or other false pretense, obtains the signature of any person to any written instrument, or obtains from any person any money or property, is punishable," etc.

This statute has persisted in our law unchanged to the present time save only that the code commission of 1919, in re-enacting it, omitted therefrom the words "with intent to cheat or defraud another."

■ ■ From the earliest days of the common law, the element of scienter, the willful and corrupt mind, has been of the essence of the crime of obtaining money or property by false pretenses. It is specifically preserved, and always has been, in our statute by the use of the word "designedly." This court has always held, in substance, that "designedly" false means in substance willfully, knowingly, and intentionally false and that a false pretense is designedly made when it is made with knowledge on the part of the maker that it is in fact false. See State v. Van Ruschen (1916) 38 S. D. 187, 160 N. W. 811; State v. Paul (1918) 41 S. D. 40, 168 N. W. 739; State v. Taylor (1921) 44 S. D. 332, 183 N. W. 998; State v. Alick, 62 S. D. 221, 252 N. W. 644. All these decisions emphasize that the false pretense contemplated by our statute as a necessary element of the crime is a knowingly false pretense and that seems to be the rule of the authorities without a dissenting voice. It was the rule recognized at the time of the drawing of the indictment in the instant case which charged in each and every count that appellant "designedly and with intent to cheat and defraud * * * did falsely and fraudulently represent and state" that certain materials were used " * * * whereas in truth and in fact *as the said Herman Pickus at the time well knew* there was used" a lesser amount of materials. It was likewise the rule recognized by the learned trial judge in the instant case when, as hereinbefore stated, he instructed the jury in part as follows:

"The three principal elements involved in the crime of obtaining money by false pretenses, are, * * * third, that the defendant at the time he presented the false writing or made the false

pretense and at the time he received the money knew that the writing or other pretense was false. Each and every one of these elements must be established by the evidence in the case beyond a reasonable doubt before the crime is established.

"The court further instructs the jury that pretense in any of the counts of this indictment could not be designedly false, without at the same time, being knowingly false, and in order to find the defendant guilty of the charges contained in any of the counts of this indictment, it is necessary for the jury to find, beyond a reasonable doubt, that the defendant knew such pretenses were, in fact, false at the time he made them."

To that instruction, however, the learned trial judge, as hereinbefore indicated, added these two sentences:

"If the accused honestly believed in the truth of the representation made although it may have been false, the offense is not committed. But making a statement that is in fact false recklessly without information to justify a belief in its truth is equivalent to making a statement knowing it to be false."

To such addition, and particularly to the second sentence thereof, appellant promptly excepted and has at all times preserved his objection thereto. It is perfectly apparent that these two added sentences were appropriated verbatim from the text of vol. 25, Corpus Juris, at page 604. They are the second and third sentences of paragraph numbered 32 on that page, save only that in the first sentence the court departed from the text by inserting the word "honestly" before the word "believed." As to the second sentence of this added instruction, the text cites in support thereof, 25 C. J. p. 604, § 32, note 18, three cases; People v. Cummings (1899) 123 Cal. 269, 55 P. 898, 899; Crawford v. State (1908) 4 Ga. App. 789, 62 S. E. 501; Rand v. Commonwealth (1917) 176 Ky. 343, 195 S. W. 802, 808. Subsequent annotations cite to this same note one more case, People v. Burgess (1927) 244 N. Y. 472, 155 N. E. 745, 746. Though the crime of false pretenses has been known to the law for appreciably more than four hundred years and though it has been dealt with by text-writers and encyclopedias and literally a host of decisions which have been universal in pointing out the necessity for knowledge, the view that, as applicable to such crime, making a statement recklessly and without information justifying a belief in its truth is tantamount

to an utterance of a statement knowing it to be false, appears to be quite a novelty. The careful brief filed by the state in this case, prepared by diligent counsel, offers no citations in support of that proposition save only the Corpus Juris text, which is very palpably the source of it, and three out of the four cases mentioned above. In a rather extended search upon our own account we have discovered nothing else more nearly approaching direct support of the point than two statements in Wharton's Criminal Law (12th Ed. 1932) one in § 1454, p. 1741, to the effect that "proof that the defendant was ignorant of a fact that he stated sustains a charge of false statement"; and the other in § 1494 on p. 1766, to the effect that "a reckless statement of a fact of which the narrator is ignorant may be equivalent to a statement he knows to be false." The sole authority cited by Wharton in support of each of the above-quoted statements is the case of Reese River Mining Co. v. Smith [1869] L. R. 4 H. L. 64. The Reese Case, however, was purely a civil action to rescind a contract for the purchase of mining stock claimed to have been made in reliance upon a false prospectus, and, so far as the point here involved is concerned, the language (per Lord Cairns) is specifically limited to the matter of civil liability, being as follows:

"But I apprehend it to be the rule of law that if persons take upon themselves to make assertions as to which they are ignorant whether they are true or untrue, they must, *in a civil point of view* be held as responsible as if they had asserted that which they knew to be untrue."

It appears then, so far as precedent is concerned, that the proposition in question has not been declared by the courts over a period of several centuries in a criminal action for false pretenses excepting as may appear in the four cases above. Some examination of those cases seems therefore to be indicated.

In the California case, Cummings had been convicted of securing a promissory note by false and fraudulent representations, and, in affirming the conviction in a very brief opinion, the court said in part as follows:

"Without descending to unnecessary details, it may be said that there was evidence that defendant stated to the Schnelles that his said tract of 16½ acres cost him $2,500 cash, and that the soil thereof, was a dark, rich loam, and all cultivated, and that it ad-

joined a certain famous orchard; also, that the statements were believed by the Schnelles, and were part of the inducement to the execution of said note. There was further evidence that in fact the land of defendant did not adjoin said orchard; that nearly all of it was rocky, covered with bowlders, uncultivated, and not susceptible of cultivation; and that defendant had paid no cash for it at all, but obtained the same as a bonus for releasing certain parties from a contract he had with them. These matters, with other evidence in the case, made a question for the jury, whether defendant uttered such representations, knowing them to be false, or (which is tantamount to knowledge of falsity) recklessly, and without information justifying a belief that they were true. In our opinion, there was some evidence tending to prove all the elements of the offense charged."

It is to be observed that the doctrine that to make a statement recklessly and without information justifying a belief in its truth was tantamount to knowledge of falsity came into this opinion via the side road of parenthetical statement. It does not appear that this declaration was in any manner essential to the decision or a turning point in the case. When an individual represents that he paid $2,500 cash for a tract of land, for which in fact he paid no cash at all, his own actual knowledge of the falsity of his statement seems quite evident. The California court appears to have had no appreciation of the fact that it was announcing a rule that had not previously been declared in the criminal law of false pretenses. The headnotes of the case do not state the point and the case has never been relied upon or followed as authority for the point by either the California court or any other court though it has been cited and relied upon in other particulars in some fifteen subsequent decisions according to Shepard's citations.

Looking next at the Georgia case (Crawford v. State), which is cited by the Corpus Juris note in support of its text statement (but which, as hereinbefore indicated, is not mentioned in respondent's brief), a rather amusing situation is disclosed and the reason for respondent's failure to cite the case becomes obvious. The opinion is one affirming a conviction of Crawford for the statutory crime of cheating and swindling. The syllabus of the case was prepared by the court and subdivision b of headnote 3 reads as follows:

"One may be defrauded by representations, the truth or falsity of which has not been investigated."

The language of this headnote is perhaps somewhat ambiguous, but a reading of the opinion discloses the fact that the "investigation" referred to in the headnote is an investigation, not by the person who makes the false representation, but by the person claiming to be defrauded thereby. It was urged by the defendant that the indictment was defective because it failed to allege that the falsity of the representation could not have been discovered by reasonable diligence on the part of the prosecutor to whom it was made, and in that connection the court said, rightly enough, as follows:

"A citizen has the right to rely, so far as the criminal law is concerned, upon representations made to him by one with whom he deals, which are apparently reasonable and truthful; and he who falsely, fraudulently, and intentionally abuses this confidence, so absolutely necessary to the conduct of commercial transactions, must be made to know that he does so at his peril."

There is not in the entire opinion in this Georgia case a single syllable lending the slightest support to the view that to make a statement without information justifying a belief in its truth is tantamount to uttering the statement knowing it to be false and indeed precisely the opposite inference is fairly deducible from another decision of the same court filed on the same day, being Laster v. State (1908) 4 Ga. App. 804, 62 S. E. 508.

Turning now to the Kentucky case of Rand v. Commonwealth, it appears that Rand was charged with obtaining money under false pretenses by falsely and fraudulently presenting a claim against Lewis county, Ky., representing that he had used upon the public roads of said county for its use and benefit 20,000 feet of lumber for which he was entitled to be paid at the rate of 10 cents per foot, when in truth and in fact he had not used such lumber or any thereof. He was convicted below, which conviction was reversed upon appeal and, in the course of the opinion reversing, the court in a very brief paragraph without discussion or citation of authority uses the following language:

"It should also be borne in mind that, although, in order to constitute guilt of one accused of obtaining money or property by false pretenses, the accused should have knowledge of the fal-

sity of the pretense, making a statement recklessly and without information justifying a belief in its truth is equivalent to the making of a statement knowing it to be false."

The state's brief in the case now before us says, "In the Kentucky case the facts were strikingly similar to those in the Pickus case." In truth, they are totally dissimilar. A complete understanding of the Rand Case requires a study also of the companion case of Sanders v. Commonwealth (1917) 176 Ky. 228, 195 S. W. 796. The situation was unusual. One Jones bid for and received a contract from Lewis county for certain highway construction, embracing, among other items, one small bridge and one large bridge, the work upon the bridges to be paid for upon the basis of "unit prices" for the various elements entering into construction including lumber used for concrete forms. Subsequently Jones and the county entered into a certain supplemental agreement, the good faith of which was not questioned though its legal validity was. By the terms of this agreement, the course and line of the highway was somewhat changed. As a result of this change, the construction of the large bridge originally contemplated became entirely unnecessary, but it did require the construction of two more small bridges not previously contemplated. These bridges would not in themselves take as much material nor be as expensive as the original large bridge, but the change in the route would make it necessary for the contractor to do considerably more grading and excavating. The contractor Jones therefore agreed to do the work according to the proposed changes for the same total cost as proposed in his original bid, "bridges, etc., to be considered." Thereafter Jones, with the consent of the county, sublet to Rand the work of building the bridges. Rand, of course, did not construct the large bridge contemplated by the original contract, but he did construct the original small bridge and the two other small bridges required in lieu of the original large bridge by the agreed change in the course of the highway. Under these circumstances, it was Rand's contention that he was entitled to demand and receive from the county for the construction of the original small bridge the amount of material, etc., actually employed in constructing it according to the bid unit prices, but for the construction of the two additional small bridges, entirely regardless of what actually went into them, the amount that would have been paid at bid

unit prices for the large bridge originally contemplated. Upon this theory Rand (or Sanders, the county road engineer) had a representative of the commissioner of roads make a survey and prepare an estimate of the total sum which the building of the original large bridge would have cost, which estimate showed that it would have been necessary, among other items, to use 19,926 feet of lumber to make forms for the concrete work. Pursuant to this estimate and acting upon the theory above outlined, Rand presented a claim to the county representing that he had used in highway construction 20,000 feet of lumber. As a matter of fact, Rand had not used that lumber, did not believe he had used it, knew he had not used it, and knew that any representation that he had used it was a false representation. The question in the case was purely one of intention. Rand freely admitted that he never built the large bridge, never used this or any other lumber in it, and used a much lesser amount of lumber in the two small bridges; but he took the position that if the large bridge had been constructed, it would have required this lumber; that under the unusual circumstances of this case the amount that would have been required to construct the large bridge was the true measure of what he was entitled to receive from the county for the construction of the two small bridges; and therefore that, although his representation was admittedly and knowingly false, there was nevertheless no intent to defraud the county. Analysis of the case reveals that the language above quoted was really used, not with reference to the falsity of the representation made by Rand (for concededly that was false and he knew it was false and admits that he knew it was false), but with reference to Rand's claimed good faith in believing that his knowingly and admittedly false statement was, notwithstanding its falsity in fact, representative of the true extent of the claim which he honestly believed he had against the county. Construing the language of the Kentucky court in the light of the facts and circumstances of the case wherein it was used, it can hardly be claimed to support the view advocated by the state in the instant case. The case is authority simply for this and nothing more; that where money is received as a result of a pretense knowingly and admittedly false in detail of fact, the maker of such pretense may nevertheless escape criminal liability if he can show that he justifiably believed that he was legally entitled to receive the amount

claimed. The Rand Case was not headnoted by the Kentucky court to the point for which the state relies upon it here and indeed it has been subsequently cited by the Kentucky court without qualification or restriction as authority for the proposition that "the defendant must have knowledge of the falsity of the pretense, statement, or token when he made it." Dennis v. Thomson (1931) 240 Ky. 727, 43 S. W. (2d) 18, 25.

We came finally to the New York case of People v. Burgess. Defendant was charged with obtaining money by false representations, which, under the New York statute (Penal Law [Consol. Laws N. Y. c. 40] § 1290), constitutes larceny. He was director, vice president, and general sales manager of a corporation. He sold a large amount of its stock to various persons and in the particular case was charged with making false representations concerning the value of the stock, the condition of the corporation, etc., in connection with a sale of stock to one Schneeburger. In a preliminary paragraph of the opinion affirming the conviction, the New York Court of Appeals, without discussion or citation of authority, said:

"He is charged with obtaining money by false representations as to existing facts—representations which he actually knew were false or which he would have known were false if he had chosen to use sources of information which were easily available, or to make such investigation as any man who desired to speak the truth would have made before he ventured positive assertion, based, upon apparent knowledge, as to matters of which he was ignorant."

It does not appear that the point was specifically argued, or that it was a turning point in the case or that this declaration was necessary to arrive at the result reached and it may very well be doubted whether the precise language of the New York court does in fact go sufficiently far to support in its fullest implications the text to which it is cited.

From the examination of these four cases, we think it must be concluded that the text statement which the learned trial judge saw fit to include in his instructions in the instant case is not dealt with at all by the Georgia case, is not supported by the Kentucky case in the light of its facts, and can claim no more than the rather incidental language of the California and New York cases. In

neither of these cases does there appear to have been any particular consideration of the point or any necessity of deciding it; in neither of them is it held or even remotely suggested that this language is apt or appropriate to submit unexplained to a jury; and in both of them it really looks as though the court, without any particular attention or necessity, and indeed almost inadvertently. injected into the criminal law of false pretenses a doctrine which had never previously been there and which does not belong there though perhaps entirely applicable in the law of torts.

[8-12] Let us now examine somewhat more particularly that portion of the court's instructions wherein he told the jury that "making a statement that is in fact false recklessly without information to justify a belief in its truth is equivalent to making a statement knowing it to be false." Just what the court may have meant or just what the jury may have understood by the word "recklessly" in this instruction offers an almost unlimited field for speculation and conjecture. Many pages have been written in the decisions discussing and undertaking to define this word "recklessly" and it has been given at least three separate and distinct meanings. First, it has been held by some cases to connote an element of willfulness—of deliberate, affirmative intent. Second, it has been held by other cases, not to imply willfulness or intention at all, but to be descriptive of a type or quantum or degree of negligence. Negligence, of course, is a failure to comply with an objective standard—the failure to exercise such degree of care as would be exercised under the circumstances by a reasonably prudent man. According to these decisions, if an individual departs, not just a little way, but a very great way, from this arbitrary standard, his course of conduct, while continuing to be negligent only, deserves a little more disfavor which will be evidenced by applying thereto the epithetical adverb "recklessly." Third, in still other cases when it is said that a man acts "recklessly," it is intended to denote that his state of mind is in some vague and scarcely definable intermediate zone between negligence and affirmative intention. It was that meaning which this court endeavored to affix to the word in Carlson v. Johnke (1931) 57 S. D. 544, 234 N. W. 25, 72 A. L. R. 1352, and which we were subsequently compelled to abandon (Wittstruck v. Lee, 62 S. D. 290, 252 N. W. 874, 92 A. L. R. 1361), because the attempted distinction

had proved unworkable and confusing. But, whatever may be the significance of the word "recklessly" standing alone, in the court's instruction now under consideration, it is either defined or modified and qualifiied by the immediately following words, "without information to justify a belief in its truth." By that language the court clearly authorized and indeed almost required the jury to disregard the actual state of mind of the appellant at the time he made the representation claimed to be false and imposed upon appellant in a criminal case the objective standard which is frequently applied to determine civil liability in tort. Under that instruction, if the jury or some of the jurors entertained the view that the representation made by appellant was false, that appellant believed the representation when he made it, but that appellant arrived at his belief on information which would not justify a reasonably prudent man in forming the same belief—in other words, if appellant was rash or careless or foolish, although honest, in arriving at the belief which in fact he entertained—then it would be the duty of the jury to hold appellant criminally liable.

The continuance of the word "designedly" in our criminal false pretense statute renders it clear beyond possibility of question that scienter or specific intent is (as it always has been) of the essence of the crime. That is not only the rule of our decisions as hereinbefore stated, but it is likewise the common understanding —the popular and received meaning of the word. The Oxford Dictionary says that an act is done designedly when it is done "by design, on purpose, intentionally"; a design is defined to be "a plan or scheme conceived in the mind and intended for subsequent execution; the preliminary conception of an idea that is to be carried into effect by action; contrivance in accordance with a preconceived plan"; to design is "to form a plan or scheme of; to conceive and arrange in the mind; to originate mentally, plan out, contrive." When a statute imposes criminal liability for the doing of any act "designedly," certainly the mental attitude of the defendant is one of the things that must be determined before his guilt can be established. In such case the standard of conduct to which the defendant is held at his peril is entirely subjective— it relates to his own state of mind.

To undertake a precise distinction between knowledge and belief or to mark the line where the one begins and the other ends

would be difficult if not impossible. Much that we are accustomed to call knowledge is only a thoroughly developed, firmly grounded, highly conventionalized form of belief. Belief has been well defined (and quite sufficiently for the purposes of this discussion) as "an assent of the mind to the truth of a declaration, proposition or alleged fact." Keller v. State (1898) 102 Ga. 506, 31 S. E. 92, 95. We believe that to which we give credence; that which we mentally accept as true. Whenever a representation is made that is in fact false, the mental attitude of the declarant with reference thereto must fall within one of four categories. First, he may know that the representation is false. Second, he may believe that the representation is false. Third, he may have neither any knowledge nor any belief whatsoever as to its truth or falsity. Fourth, he may believe the representation to be true. Each of the first three of these categories is distinguishable from the fourth in this—that in each of the first three the affirmative element of belief in the truth of the representation is absent. In the first two not only is the declarant lacking in mental assent to the truth of his declaration, but his condition of mind is precisely the opposite—his mental assent is to the falsity of the declaration. In both the first and second categories it must, of course, be held that the declaration is designedly false. The third category presents a much closer case. A declaration is made; the mental attitude of the declarant toward it is, so to speak, neutral; he has neither knowledge nor belief as to its truth or falsity; he does not know; he has no data upon which to found a belief either one way or the other and he has formed no belief; it develops that the representation is in fact false. Has the declarant made a designedly false representation within the meaning of the criminal law? Possibly he has. Ethically there appears to be little difference when a man makes a false representation for the purpose of inducing another to act for his benefit between the quality of conduct of the man who knows or believes his representation is false and that of the man who has neither knowledge nor belief concerning it, but nevertheless makes the representation, neither knowing nor caring whether it be true or false. Incidentally we may say that it is our view that this third category (as distinct from the fourth) in as far as the courts really intended their language to reach in the California and New York cases hereinbefore considered. The difficulty in the case now

before us is that the language of the instruction given is broad enough to include not only the third category but also the fourth and may very well have been so understood by the jury.

There is probably no mental process more highly individualistic than the formation of a belief. In the case of any individual, it depends on his particular mental and psychological equipment. Emotion colors belief and we very readily believe what we want to believe. Some individuals believe more easily than others and temperamental differences and previous experiences largely affect the situation. If three individuals are separately given identical data relating to proposition X, concerning which proposition none of the three have any pre-existent information, knowledge, or belief, it would be neither an unusual nor an unpredictable result to have one of the individuals announce his belief in the truth of X, the second his belief in the falsity of X, and the third his desire for further information before arriving at any opinion either way. In this fourth category (i. e., where declarant does believe his declaration to be true), so far as concerns civil liability in the field of torts, we sometimes set up an objective standard just as we do elsewhere with relation to negligence. We endeavor to establish more or less arbitrarily in every case a certain quantum of information which would, we say, be sufficient to lead the mind of our old friend "the reasonably prudent man" to belief. If in any given case an individual forms a belief concerning a proposition on a lesser quantum of information or if he forms a belief without seeking readily available information, we say he is negligent. We are quite likely to christen his belief as unreasonable or unjustifiable. If an over-sanguine temperament leads the individual to arrive at a belief upon a quantum of information very much less than we think our fictitious reasonably prudent man would demand before his mind would assent to the same belief, we are very likely to say that the conduct of the individual is rash or reckless, and perhaps to say that a belief arrived at negligently or rashly or recklessly is "tantamount to no belief at all." This last statement, of course, is not in any precise sense true and no one claims that it is. Belief can never be identical with nonbelief. The statement is merely a convenient form of words for expressing the idea that the law of torts will in some instances hold a man to the same measure of liability if his belief is carelessly or rashly arrived at that it

would if he had no belief at all or had belief or knowledge to the opposite effect. In other words, he must at his peril measure up to an objective standard of conduct. If he does not measure up to that standard, he must respond civilly in damages to the man who was injured by his failure so to do even though such failure was not designed or intentional.

The law of civil liability in tort for fraud is very largely judge-made and it grows principally by judicial decision. If the courts in this field see fit to hold the individual to an objective standard and to impose upon him the same measure of civil liability, whether his representation be knowingly false or whether it be founded upon a belief which it is thought that a reasonably careful and prudent man would not have arrived at from the same information, there is probably no particular objection. It amounts merely to imposing upon the individual a duty of care which one man ought in fairness to exercise in his dealings with another and in default of which he must return what he has received or respond for the damage he has caused. As to whether a man should be held liable in tort for negligent misrepresentation, all courts are not in harmony. The English courts probably do not go to that extent, at least since the decision in Derry v. Peek (1889) 14 App. Cases 337. Of the American courts some follow the rule of Derry v. Peek and others do not. Probably all the courts, American and English, would agree that civil liability in tort exists where the misrepresentation is, as some of the cases phrase it, "with a reckless disregard as to whether it is or is not true," which I take it is intended to describe the cases falling within the third category hereinbefore set out, where a representation is made with an utter lack of knowledge or belief as to its truth or falsity, and where the declarant is completely indifferent as to whether it is true or false. Even in the field of torts, there is considerable controversy as to whether civil liability for negligent misrepresentation, if imposed at all, should not be imposed upon a theory comparable to that of warranty or estoppel rather than fraud. See 24 Ill. Law Rev. 749; 18 Va. Law Rev. 704; 42 Harv. Law Rev. 733; 14 Harv. Law Rev. 184; 1 Dak. Law Rev. 33.

But whatever the courts may have seen fit to do in the field of civil liability for torts the situation with reference to criminal liability for false pretenses must be governed and controlled by our

statute. Perhaps it would be just and right that a man who makes a careless or negligent misrepresentation should be responsible not only civilly but also criminally, but if he is to be criminally held it must be by legislative act and not by judicial decision. The word "designedly" in our criminal statute has, as hereinbefore pointed out, a well-recognized meaning. It covers the case only of affirmative evil intent; that is, the man who knew or believed that his representation was false; possibly the man who knew he had no belief whatever concerning it when he made it. It cannot and should not be stretched by judicial decision to cover the case of the man who believed his representation true even though such belief was erroneous or unjustifiable or careless or ill-founded or based upon information which a juror or a reasonably prudent man would deem insufficient. The instruction in the instant case goes too far. It permits, if it does not require, the jury to find the appellant guilty even though he actually believed in his own mind in the truth of the representation he made if they should think that he arrived at that belief "recklessly" (whatever that may mean), or without sufficient information to justify it whether according to the standard of the jurors or to the standard of the reasonably prudent man. Certainly it was for the jury to say whether or not appellant knew of the falsity of his representation—whether or not he believed in it when he made it. Undoubtedly the evidence upon that point in every case will of necessity be largely circumstantial. If the information upon which appellant here claimed his belief to be based was in the opinion of the jurors extremely scanty, that would be a circumstance which, with others, might induce the jury to determine and hold, as a finding of fact, that he had no such belief or that he knew his representation was false. But this instruction goes beyond that. It permits a juror, who might be convinced that appellant spoke truly when he claimed that he believed his representation to be true when he made it, to find appellant guilty notwithstanding such belief because he, the juror, was of the opinion that appellant's belief though actually existent was not based upon sufficient information to justify the formation of such a belief. The instruction in so permitting runs contrary to the terms of the criminal statute and overlooks design. This cannot be done. Few doctrines in criminal law today receive more unquestioned adherence than that announced by Chief Justice Mar-

shall something over one hundred years ago in the case of United States v. Wiltberger (1820) 5 Wheat. (18 U. S.) 76, 5 L. Ed. 37, when he held that no court can or should by construction or interpretation make that a crime which is not prohibited and punishable by common law, statute, or ordinance. Our statute contemplates punishing a false pretense designedly made. It cannot be designedly made when the maker believes it true, however erroneous, unjustifiable, or insufficiently grounded his belief may be. In the Wiltberger Case Chief Justice Marshall said:

"The rule that penal laws are to be construed strictly, is, perhaps, not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is to define a crime, and ordain its punishment. * * * We can conceive no reason why other crimes, which are not comprehended in this act, should not be punished. But Congress has not made them punishable, and this court cannot enlarge the statute."

Quite possibly the Legislature might see fit to inflict criminal punishment for the making of a false representation harmful to another without regard to scienter, design or intent. They might require a man, not only at peril of civil restitution or damages but at peril of criminal punishment, to be both careful and accurate. Indeed in some instances Legislatures seem so to have done. See State v. Dobry (Iowa 1933) 250 N. W. 702, and discussion thereof in 20 Va. Law Rev. 589 and 47 Harv. Law Rev. 714. But the Legislature has not so done by a statute providing for the punishment of false representations designedly made; and where the Legislature has not the court cannot.

In a California case, where the charge was procuring false evidence by taking an affidavit from a person known to be incapable of making an affidavit, the trial court charged the jury as follows, "In regard to the question of knowledge, did these defendants know, at the time said affidavit was presented to said Isabella Clark for her to subscribe and swear to, that she was of unsound mind? And the question here arises, what is legal knowledge of a fact? There is great misapprehension in the popular mind on this subject. There seems to be a prevalent notion that no one

is chargeable with more knowledge than he chooses to have; that he is permitted to close his eyes upon all sources of information, and then excuse his ignorance by saying that he does not see anything. While it is true that a man is not supposed to have known facts of which it appears he was ignorant, yet, if he has the means of ascertaining the true state of facts by the exercise of ordinary diligence, he is bound to do so, and if, instead of so doing, he is grossly negligent or culpable in not using such diligence, then his ignorance is no defense for any criminal act committed by him. In criminal cases, as well as civil affairs, every man is presumed to know everything that he can learn upon fair and reasonable inquiry, when he has facts in his possession which suggest the inquiry; that is, when the surroundings are such as to put him upon inquiry," and in reversing the case the Supreme Court said:

"If such a rule ever obtains in a criminal case, it certainly can have no application to an offense of this character. The rule is nullus reus nisi mens sit rea. The rule of caveat emptor as to notice cannot apply to criminal responsibility. It is not at all analogous to the rule according to which it is sometimes conclusively presumed that one intended the natural and obvious consequences of his acts, and will not permit him to say he did not know that the consequences would follow. Nor is it like those cases of involuntary manslaughter in which carelessness or recklessness are held to be criminal.

"Undoubtedly, there are cases in which language similar to that contained in the charge of the learned judge is used; but they are all cases in which a duty is imposed upon the person to inquire, and not to do so is itself a dereliction. * * *

"But in this case a special intent was required to make out the offense. It is like the offense of receiving stolen goods, larceny, or an assault with a particular intent. If one, acting in good faith, takes the property of another, believing it to be his own, he is not guilty of larceny, although the mistake is the consequence of gross carelessness.

"So the receiver of stolen goods must know they are stolen, and it will not do to say that his failure to know through gross negligence is equivalent to knowledge. If a case could arise, however, in which it should appear that he suspected the fact, and abstained from inquiry lest he should know, knowledge might be in-

ferred. One must have some knowledge of the fact before he can close his eyes lest he may know. Of course, I admit the relevancy of proof of opportunity as bearing upon the issue of actual knowledge. But there must be such actual knowledge, and facts which would ordinarily suggest inquiry are not sufficient. The jury must believe that they did in fact suggest the inquiry to the defendant." People v. Brown (1887) 74 Cal. 306, 16 P. 1, 2.

In United States v. Shellmire (1831) Fed. Cas. No. 16,271, the court said (omitting citation of statute) :

"The statute makes it of the essence of the offence of perjury, that it be committed 'wilfully' and 'corruptly.' Such are the very words of the law, which in our minds are not and cannot be taken as synonymous with 'rashly' and 'inconsiderately' swearing as the belief of the witness prompts him. His negligence or carelessness in coming to that belief or conclusion of the mind, without taking proper pains to enable him to ascertain the truth of the facts to which he swears, does not make his oath corrupt, and perjury cannot be wilful where the oath is according to the belief and conviction of the witness as to its truth. It could not be asserted, consistently with any legal principle, that an indictment for wilful and corrupt perjury could be sustained, by proof of a witness having sworn rashly and inconsiderately to what he believed to be true."

In a Georgia case, wherein defendant was convicted of the offense of cheating and swindling, the court instructed the jury as follows, "If you should come to the conclusion beyond a reasonable doubt that the seller represented the horse to be sound, a good farm work horse, work anywhere with him, he was all right, a good farm horse; that these representations proved to be false; that he gave fifty dollars by reason of the making of these representations by the seller; and the defects were such that an ordinarily prudent man could not have seen the defects himself, and the seller from all the circumstances should have known what the defects were,— it would be your duty to render a verdict of guilty against the defendant," and in reversing the case the Supreme Court said (the italics as given appearing in the opinion) : "This charge contains an erroneous proposition of law, which must have been hurtful to the defendant. In effect, the jury were instructed that, if the accused made the representations charged, and if they were false,

and the defects in the horse were latent, and the prosecutor relying on them paid his money for the horse, and the seller *should* have known of such defects, he was guilty. The accused could not, under such circumstances, have been convicted, unless at the time he made the representation he *knew* them to be false. Since the deceitful means necessary to sustain a conviction in a case of this character involve *knowledge* of the falsity of the representation by the seller, no action or proceeding can be maintained without proof of the *scienter*. Deceit is the foundation of the action, which cannot exist without knowledge of the falsity of the representation upon which the other party acted. Mr. Wharton is amply supported by authority when in his Criminal Law, in discussing this subject, he says (volume 2, § 1185) : 'The statement must not only be false in fact, but false to the knowledge of its utterer.' The knowledge that the representations were false must be proven to exist before the offense charged is made out. Such knowledge may, however, be proven by circumstances, including the opportunities which the accused had to ascertain the facts; but it must be proven in some way to the satisfaction of the jury, before a conviction is authorized." Waterman v. State (1901) 114 Ga. 262, 40 S. E. 262, 263.

In a Delaware case in the Court of General Sessions [State v. Hartnett (1909) 7 Pennewill (23 Del.) 204, 74 A. 82, 83] the defendant was charged with obtaining money from a county by false pretenses by presenting an excessive bill for board and lodging furnished to prisoners, and the court, in charging the jury, pointed out that a crucial question was whether the defendant at the time he presented the bill knew that it was false and whether or not "defendant knowingly made a false pretense; *that is, that he presented, or authorized to be presented, * * * a false bill, he himself actually knowing at the time that such bill was false*," and in that connection the court said, "We cannot charge you, as requested by the state, that if the defendant knew or should have known that the bill presented to the levy court was false and fraudulent, and was prepared for such purpose under his direction by his servants or agents, such circumstances are sufficient to support a guilty knowledge of the defendant. We think this prayer contains an erroneous proposition of law," and then, after quoting from the Georgia case of Waterman v. State last above cited,

proceeded: "So we say to you in this case that the bill presented to the levy court must not only have been false in fact; but false to the knowledge of the defendant; otherwise, there can be no conviction."

In the Iowa case of State v. Sherman (1918) 183 Iowa 42, 166 N. W. 674, 680, in reversing a conviction for obtaining property by false pretenses, the court said:

"The next point is: Did the defendant know that the representations were false at the time they were made, if made?

"There is absolutely no evidence to establish this fact, except that the defendant was president of the company at the time, and that a year later than the time the representations were made some evidence was introduced tending to show that the stock was then worthless. The burden is on the state not only to show that the representations were made and that they were false, but that the defendant knew they were false at the time he made them.

"It is true that in civil actions for fraud it has been held that a statement that a fact exists as of the knowledge of the one asserting the fact, when he has no knowledge of the fact, and when it is made recklessly and for the purpose of inducing another to believe it to be true, followed by proof that it was in fact not true, makes the scienter required in civil actions. There is no proof in this case that the defendant knew the fact to be untrue, if untrue. In State v. Rivers, 58 Iowa 102, 12 N. W. 117, 43 Am. Rep. 112, the defendant was indicted for obtaining money and property by false pretenses. This court said: 'If he made such representation, knowing that it was not a valid lien, and the cashier was thereby induced to give up the * * * mortgage, he is guilty; but if he believed it to be true, or did not know it to be false, * * * he is not guilty.'"

. To the same effect are the subsequent Iowa cases of State v. Hixson (1928) 205 Iowa 1321, 217 N. W. 814, and State v. Huckins (1931) 212 Iowa 283, 234 N. W. 554, the latter case in particular pointing out clearly the distinction between the rule applicable in civil cases and that governing in a criminal action for false pretenses. Cf. also People v. Von Tiedman (1898) 120 Cal. 128, 52 P. 155; Scott v. Cook (1864) 1 Duv. (62 Ky.) 315; Thomas v. State (1883) 71 Ga. 252.

To summarize with reference to the instructions, no authority seems discoverable which approves instructing a jury in a criminal false pretense case in the language employed in the instant case; such authorities as have dealt with the precise point of the use of this or similar language in an instruction have held it bad; as a matter of legal principle it seems very plain that it is bad. We see no escape therefore from the conclusion that the instructions here given compel a reversal.

■■■ We come next to another, though somewhat related, matter. As hereinbefore recited, the jury in this case returned a verdict of not guilty on all the counts excepting only count 2. Upon that count the jury inserted in the form furnished them by the court for the return of a verdict of guilty the words "recklessly without information to justify truthfully, did obtain," so that the verdict as returned read, "We, the Jury in the above entitled cause find the defendant Herman Pickus guilty of obtaining money recklessly without information to justify truthfully, did obtain by means of false pretenses as charged in Count Two of the information," etc. It is difficult to understand why the court ever received this verdict. It was garbled up in such fashion that it was not in any proper sense of the words either a general or a special verdict (sections 4918, 4919, R. C. 1919) and the court should have directed reconsideration under the provisions of section 4929. Appellant urges that this form of verdict is entirely insufficient to support the judgment against him. The only reply to that contention which the state makes in its brief is that, if the instructions of the court correctly state the law, then the verdict is sufficient. The validity of that conclusion need not be determined because, in any event, as hereinbefore pointed out at some length, the premise is unsound. The instructions of the court did not correctly state the law and consequently a verdict in this form could not be adequate. It is elementary that the verdict in a criminal case to support a judgment must find against the defendant on all material points either within its own four corners or by reference to the indictment or information. This verdict does not so do and is manifestly insufficient to support the judgment. Cf., Territory v. Conrad (1877) 1 Dak. 363 (348), 46 N. W. 605; State v. Gunderson (1919) 42 N. D. 498, 173 N. W. 791; Kimball v. Territory (1911) 13 Ariz. 310, 115 P. 70; Donovan v. People (1905)

240

215 Ill. 520, 74 N. E. 772; People v. Lee (1908) 237 Ill. 272, 86 N. E. 573; State v. Jukanovich (1915) 45 Utah 372, 146 P. 289.

Appellant further urges that the verdict returned by the jury in this case not only fails sufficiently to find that appellant knowingly or designedly made a false representation, but amounts, in substance, to a finding of the converse; to-wit, that defendant's representation was not knowingly false. Appellant therefore argues that the verdict is not only insufficient to sustain the judgment (as we have held above), but that it really amounts to a verdict of acquittal and entitles appellant to the entry of a judgment of dismissal thereon. Just what the jury may actually have thought or had in mind is impossible to determine from this verdict. Certainly it is not sufficient to support a judgment of conviction, but we are not willing to hold that such verdict, either in terms or by necessary fact implications from its words, amounts to a verdict of acquittal.

Being of the opinion that the court erred in instructing the jury and that the form of the verdict as returned was insufficient to support the judgment, it follows that the judgment and order appealed from must be and they are reversed.

ROBERTS, P. J., and WARREN and RUDOLPH, JJ., concur.

POLLEY, J., (concurring specially). While I concur in a reversal of the judgment in this case, I do not agree with the majority of the court in upholding the indictment upon which the defendant was tried. In drawing and impaneling the grand jury that returned this indictment, no attempt was made to follow the provisions of the law. The departure from the requirements of sections 5292, 5293, 5294, 5297, and 5298, especially 5297, is more than mere irregularities that may be disregarded. The statute provides, with much detail, the steps necessary to draw and impanel a legal grand jury and I do not think the statutory methods should be set aside and some other way, though "just as good," adopted.

The trial court committed reversible error in giving the instruction pointed out in the opinion written by Judge CAMPBELL, and the verdict is too indefinite, if not altogether unintelligible, to support the judgment.