# DANIEL D. RODERICK v. STATE OF MARYLAND

[No. 140, September Term, 1969.]

*Decided March 10, 1970.*

The cause was argued before MURPHY, C.J., and AN-DERSON, MORTON, ORTH, and THOMPSON, JJ.

*Malcolm B. Tebbs* for appellant.

*James F. Truitt, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, T. Bryan McIntire, State's Attorney for Carroll County,* and *J.*

*Robert Johnson, Assistant State's Attorney for Carroll County,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

Appellant, a Maryland State Trooper, was convicted of larceny after trust for failure to return, after he had been suspended from duty, various items of personal property and effects which had been issued to him by the Department of Maryland State Police to be used in his official capacity as a law enforcement officer. In this appeal he contends that his conviction should be set aside since the State failed to prove a fraudulent conversion as required by the controlling statute, Md. Code, Art. 27, § 353. We agree.

The record shows that appellant, who had become a State Trooper in 1956, was notified on March 15, 1968, that his services were terminated. On April 1, 1968, he voluntarily delivered to the quartermaster division of the Department various items of State property of an approximated value in excess of $500.00 which had been issued to him during his years of service as a Trooper. According to an equipment inventory card offered in evidence by the State, he failed to return a badge ($5.50), a Criminal Law Digest ($3.00), a training regulation book ($2.50), handcuffs and case ($11.40), helmet and liner ($.25), baton ($2.50), revolver and holster ($58.-89), and a reefer ($57.45).[1] In addition to these items which had been issued to him at the time of his appointment, some twelve years before, he failed to return an I.D. card and a gasoline credit card.

Trooper Dattilio testified that in February 1968 he was directed to visit appellant's home at which time he notified him that he had been suspended from duty and that "a revolver, I.D. card, gasoline credit card and badge" should "be turned in." According to the Trooper, appellant advised him that "he wasn't going to give them to

---

1. The figures, according to the testimony, represent cost of the items at time of issue.

me", stating that "he would return them to Headquarters when he was ready to do so."

Trooper Crout testified that he had never "officially" contacted appellant concerning the return of the equipment, although he did have a conversation with him about the middle of March 1968. When asked to relate the conversation, he replied (according to the transcript):

"Q. Where did you contact the defendant?

A. I dropped by his home on Church Street, in New Windsor.

Q. And did you have a conversation with him concerning this equipment?

A. Yes, I did.

Q. Tell us as accurately as you can the gist of that conversation?

A. Well I was off duty and I dropped by in an act of friendship. Danny answered his door and he was studying, studying, he goes to school. And I informed him that I dropped by to let him know that the State of Maryland was seriously thinking of preferring charges against him for failing to turn in his equipment. And at that time I was on my way going past the Westminster Barrack and if he had any of it to turn in I would gladly take it along in and give it to the Sergeant Major.

Q. What response, if any, did you get from the defendant?

A. Trooper Roderick told me that he didn't have any of this equipment, that he could give me to turn in, that it had become lost in his home.

Q. Did you have any further conversation?

A. We talked. Small talk. And I told him that if I could have helped him that I would have done it at that time.

Q. I mean did you have any further conversation relating to this matter which is the subject of this proceeding?

A. No sir. He just informed me he just didn't have it. He couldn't give it to me to turn in."

Appellant then took the witness stand and testified as follows:

"Q. And had you or did you return certain equipment to the State Police?

A. I did.

Q. Do you remember the value of that?

A. Five hundred and some odd dollars worth.

Q. And there was some that you did not return?

A. That's correct.

Q. Why didn't you return it?

A. Because I could not locate it.

Q. Had you made every effort to locate it?

A. I did.

Q. Did you have any idea what, perhaps, could have happened to it?

A. No sir, I do not.

Q. Do you know where it is now?

A. No sir.

Q. Did you have any—did you intend to deprive the State of Maryland of that property?

A. No, I did not.

Q. Did you fraudulently convert that property?

A. No sir, I did not.

Q. Did you intentionally take the property?

A. No, absolutely not.

Q. Would you have returned it if you could have returned it?

A. Yes sir. I would have.

Q. Is there any earthly reason why you would keep it for any purpose whatsoever?

A. I can't think of any. It would be of no value to me whatsoever."

* * *

"Q. And did you offer on many occasions to pay whatever it was that was due for this?

A. That is correct. In fact I offered to pay the State's Attorney prior to calling you for counsel.

Q. And you received a letter from Magistrate Simpson over here did you not to come down to show cause why a warrant shouldn't be issued for your arrest?

A. That is correct.

Q. Did you appear?

A. Yes, I did.

Q. And did you again renew your offer to make the State of Maryland whole in this case?

A. That's correct. I told Judge Simpson that I did not have the property and that I was more than willing to reimburse the State to the full value of it."

On cross-examination he conceded that he had told the Magistrate and the State's Attorney that the items were kept in a box "in the foyer where all the trash containers were placed" and that "it was a possibility" that his children "had thrown them out in the trash." He also stated that he looked for the items in his home, without success, but had not contacted "the people who collect trash and garbage" since "the dump is burned each week." Under vigorous cross-examination he admitted that "he wasn't particularly happy" about the circumstances surrounding the termination of his services as a Trooper, but asserted that "if I had hard feelings it wouldn't be against the entire Department."

Md. Code, Art. 27, § 353, provides, in part:

"Any person who shall be entrusted with the possession of goods or things of value for the purpose of applying the same for the use and

benefit of the owner or person who delivered the goods and things who shall fraudulently convert the same to his own use, shall * * * where the value of the goods or things so converted is less than one hundred dollars, be deemed guilty of a misdemeanor * * *."

It is apparent that before an individual charged with violating this statute may legally be convicted, there must be proof that the goods entrusted to him were *fraudulently* converted to his own use. Otherwise stated, it must be shown, beyond a reasonable doubt, that there was a wilful, deliberate conversion of the items entrusted to the accused and that there was a purposeful refusal, accompanied by a fraudulent intent, to return them to the rightful owner. As stated in Perkins, *Criminal Law* 675 : "The word 'fraudulent' when found in the definition of a crime, signifies 'an intent to defraud' and whether the word or the phrase is employed in a particular instance, it is largely a matter of personal preference. The point to be emphasized is that any crime which requires fraud for its perpetration is one which includes a specific intent whether or not the word 'intent' is found in the definition."

With this general principle in mind, we have carefully scrutinized the record before us and it is evident that the State has failed to present evidence legally sufficient to prove that the failure of the appellant to return the items here in question to the Department of Maryland State Police was accompanied by a specific intent to fraudulently convert them to his own use as required by the statute. While it is true that proof of a fraudulent intent is seldom adduced directly and more often must be found inferentially, there must be evidentiary facts upon which a rational inference of such intent may be found, beyond a reasonable doubt. In the case at bar, the only evidence presented by the State to prove the *mens rea* of the offense charged was a failure to return the items. On the other hand, the State's own witnesses tes-

tified directly that the appellant advised them that he would return the items to Headquarters rather than to the local barracks and that, finally, he was unable to return them because they had become lost. Moreover, there was uncontradicted evidence indicating that the appellant "on many occasions" offered to reimburse the State for the monetary value of the missing items which the trial judge concluded had a depreciated value of $96.30. It is also clear that the appellant had returned the great bulk of the property issued to him which had a value in excess of $500.00. The mere failure to return the missing items will not, without more, support a finding of fraudulent conversion since "there is no presumption of law, either conclusive or disputable, that an act was done with any specific intent * * *" Perkins, *supra,* 674. We are of the opinion that the State failed to establish the requisite fraudulent intent contemplated by the statute and, accordingly, we feel that the lower court's judgment of conviction was clearly erroneous. *Pachmayr v. State,* 1 Md. App. 270; Md. Rule 1085.

The judgment of conviction is vacated. The case is remanded for a new trial provided that the State promptly satisfies the trial court that it can produce additional probative evidence; otherwise, a judgment of acquittal shall be entered forthwith by the trial court. See *Gray v. State,* 254 Md. 385.

> *Judgment reversed and case remanded for further proceedings in accordance with this opinion.*