600 A.2d 841

George BARGHOUT

v.

MAYOR & CITY COUNCIL.

Misc. No. 9, Sept. Term, 1991.

Court of Appeals of Maryland.

Jan. 28, 1992.

312

Imad K. Dajani (P. Paul Cocoros, both on brief), Baltimore, for appellant.

Burton H. Levin, Asst. Sol. (Neal M. Janey, City Sol., both on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL JJ.

CHASANOW, Judge.

This case comes to us from the United States District Court as two certified questions pursuant to Maryland Code (1974, 1989 Repl.Vol.), Courts & Judicial Proceedings Article, § 12–601. We are asked the following:

I. Can an individual be convicted of violating Article 19, § 50 of the Baltimore City Code, if he or she sincerely believes that his or her conduct conforms to kosher requirements, even though the City inspector may disagree, or even though the individual's conduct might in fact be violative of religious laws?

II. Does Article 19, § 50 of the Baltimore City Code violate Article 36 of the Declaration of Rights of the Constitution of Maryland?

For the reasons set forth below, the answer to both questions is "No."

## The Facts

Baltimore City has a Bureau of Kosher Meat and Food Control (the Bureau), consisting of three orthodox Jewish rabbis and three laypersons, whose duties include ensuring that food offered for sale in the city as kosher is, in fact, kosher. Baltimore City Code (1983 Repl.Vol.), Article 19, § 49.[1] The Bureau employs an inspector to help carry out its duties. Art. 19, § 49(g). This paid position was necessitated by the "[i]ncreasing workload, growth in the number and the metropolitan area-wide spread of outlets for Kosher products...." Memorandum to the Chairman of the City Council's Committee of Budget and Finance from George Piendak, Fiscal Policy Analyst for the City Council, Febru-

---

1. Falsely labeling non-kosher food as kosher is proscribed by state law as well. Maryland Code (1975, 1990 Repl.Vol.), Commercial Law Article, § 14–901 *et seq.* These statutory provisions are not before us.

ary 3, 1977. Purveyors who fraudulently market non-kosher food as kosher can be fined and/or imprisoned under Art. 19, § 50, which is titled "Sales to defraud" and declares:

"Any person, firm or corporation who, with intent to defraud, sells, exposes for sale, any meat or meat preparation, article of food or food products, and falsely represents the same to be Kosher, whether such meat or meat preparation, article of food or food product, be raw or prepared for human consumption, or as having been prepared under, and/or of a product or products sanctioned by the orthodox Hebrew religious rules and requirements or under the dietary laws either by direct or indirect statement, orally or in writing, which might reasonably be calculated to deceive or lead a reasonable man to believe that a representation is being made that such food, meat, meat preparations or food product is kosher or prepared in accordance with the orthodox Hebrew religious rules and requirements and/or dietary laws, or falsely represents any food products or food or the contents of any package or container to be so constituted and prepared, by having or permitting to be inscribed thereon the word "Kosher" in any language, or sells or exposes for sale in the same place of business both kosher and non-kosher meat or meat preparations, or both kosher and non-kosher food or food products, either raw or prepared for human consumption, and who fails to indicate on his window signs and all display advertising, in block letters of at least four inches in height, "Kosher and Non–Kosher Meat Sold Here," or "Kosher and Non–Kosher Food Sold Here"; or who exposes for sale in any show window or place of business both kosher and non-kosher meat or meat preparations or kosher and non-kosher food or food products, either raw or prepared for human consumption, and who fails to display over each kind of meat or meat preparations so exposed a sign in block letters at least four inches in height reading "Kosher Meat," or "Non–Kosher Meat," as the case may be,

or "Kosher Food" or "Non–Kosher Food," as the case may be, or who displays on his window, door, or in his place of business or in hand bills or other printed matter in or outside of his business or in hand bills or other printed matter distributed in or outside his premises, words or letters in Hebraic or other characters, or any sign, emblem, insignia, six point star, symbol or mark in simulation of same, without displaying in conjunction therewith in English letter of at least the same size as such characters, signs, emblems, insignia, symbols or mark, the words "We sell Kosher meat and food only" or "We sell Non–Kosher meat and food only" or "We sell both Kosher and Non–Kosher meat and food," as the case may be is guilty of a misdemeanor punishable by a fine of not less than fifty dollars ($50.00) or more than five hundred dollars ($500.00) or by imprisonment of not less than thirty (30) days or more than one (1) year, or both, at the discretion of the Court. Possession of non-kosher meat and food, in any place of business advertising the sale of kosher meat and food only is presumptive evidence that the person is [sic] possession exposes the same for sale with intent to defraud, in violation of the provisions of this section. In order to comply with the provisions of this section persons dealing with either kosher meat, meat preparations, food and/or food products only, or persons dealing with both kosher and non-kosher meat, meat preparations, food and/or food products must adhere to and abide by the orthodox Hebrew religious rules and regulations and the dietary laws; otherwise he shall be in violation of this section."

George Barghout, whose sales practices are now before us, owned and operated an establishment called Yogurt Plus in a Baltimore shopping mall. On September 1, 1989, someone called the Bureau and complained that Yogurt Plus was violating kosher laws. That same day, the agency dispatched their inspector, Rabbi Mayer Kurefeld, to investigate.

When he arrived on the scene, Rabbi Kurefeld saw an electric sign outside Yogurt Plus advertising "kosher hot dogs"; inside, the menu board also indicated that the store offered "kosher" hot dogs for sale. But the "kosher" hot dogs, the inspector found, were not up to the promised standard. There was nothing wrong with the hot dogs themselves when they originally came from the package, Rabbi Kurefeld explained. They at least started out as kosher. The predicament was in their preparation once they left the package. Kosher hot dogs were placed on a rotisserie next to non-kosher Polish sausages and non-kosher hot dogs and, according to Rabbi Kurefeld, grease from the sausages and non-kosher hot dogs would contaminate the kosher hot dogs. Something kosher, contaminated by grease from a non-kosher item, such as a Polish sausage, would thereby lose its status as a kosher product, Rabbi Kurefeld explained in court. Rabbi Kurefeld said he advised Barghout "that a person is paying more money for kosher and ... deserves to get what he pays for and that's the intent of the law." To call something kosher when it didn't warrant that designation amounts to false advertising, the inspector explained.

A violation warning was written up and given to Barghout, but the vendor refused to sign it. The inspector told Barghout that he would be given time to correct the situation.

On October 11, Rabbi Kurefeld said he returned to Yogurt Plus and found the same problem, even though the City Solicitor's office had also sent Barghout a warning letter. The inspector wrote another violation report. According to the rabbi's testimony, he came back twice again—on November 24, 1989, and May 15, 1990—and discovered that the cooking methods about which he had originally cautioned Barghout had not been changed. Another warning letter was sent, and Barghout was finally charged with violating the ordinance.

On November 15, 1990, a judge of the District Court of Maryland for Baltimore City found Barghout guilty of

violating Art. 19, § 50. The vendor was fined a total of $400 plus $100 in court costs. Two months later, Barghout sought a declaratory judgment from the United States District Court for the District of Maryland that Art. 19, §§ 49 and 50 of the City Code violated the First and Fourteenth Amendments of the United States Constitution. On May 31, 1991, Judge Frederic N. Smalkin certified the above questions to this Court for resolution before reaching the federal constitutional claims presented by Barghout.

## The First Question

As we have observed many times, the cardinal rule of statutory interpretation is to ascertain and effectuate the legislative intention. *Kaczorowski v. City of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987). A statute must be construed "with reference to the purpose, aim or policy of the legislature reflected in that statute." *Revis v. Automobile Ins. Fund,* 322 Md. 683, 686, 589 A.2d 483, 484 (1991); *Harford County v. University,* 318 Md. 525, 529, 569 A.2d 649, 651 (1990). In achieving those results, our primary focus is on the words themselves, which must be given their natural and ordinary meanings in the context of the legislative goals. *State v. Bricker,* 321 Md. 86, 92, 581 A.2d 9, 12 (1990); *Webb v. State,* 311 Md. 610, 618 n. 2, 536 A.2d 1161, 1165 n. 2 (1988). A court must review a statute's language in relation to all its provisions and harmonize individual sections as parts of the whole. *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471, 474–75 (1988); *Pennsylvania Nat'l Mut. v. Gartelman,* 288 Md. 151, 159, 416 A.2d 734, 738 (1980).

■ In his Memorandum and Certification Order, Judge Smalkin observed that the first sentence of § 50, which contains 500 words, "exemplifies legislative drafting at its worst." Still, we are able to divine the statute's purpose and find that the Baltimore City Council meant to punish only those who knowingly deceive customers who buy products labeled as kosher but which the vendors do not believe are up to that standard. The law is not designed to punish

sellers who honestly but incorrectly believe that their products are kosher. The ordinance specifically starts out by saying that it covers acts done "with intent to defraud."

As the City points out in its well-reasoned and thorough brief, the second and third sentences of the ordinance add no new offenses to those spelled out in the first. What the second sentence does is indicate that, when a vendor possesses non-kosher food in a place of business advertising the sale of kosher food *only,* there is a rebuttable presumption that he or she had the requisite specific intent to defraud. The third and final sentence of the ordinance merely sets forth the standards to be applied when determining whether a particular article of food is kosher.

Our interpretation of the purpose of, and intent required by, the Baltimore City ordinance is in concert with decisions of other courts that have examined similar provisions of New York laws punishing the sale of food improperly labeled as kosher. The City contends that Baltimore's kosher meat law is "patterned after" a New York statute enacted in 1915 and upheld nearly three quarters of a century ago in *People v. Atlas,* 183 A.D. 595, 170 N.Y.S. 834 (1918), *aff'd without opinion,* 230 N.Y. 629, 130 N.E. 921 (1921). The *Atlas* court noted:

> "The purpose of the statute, manifestly, is to prevent and punish fraud in the sale of meats or meat preparation, and it only operates on those who knowingly violate its provisions, for it is expressly provided that there must be both an intent to defraud and a false representation."

170 N.Y.S. at 835.

A subsequent version of the New York statutory scheme substantially similar to our statute, as well as to the one upheld in *Atlas,* was reviewed by the United States Supreme Court in *Hygrade Provision Co. v. Sherman,* 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402 (1925). Although the basic issue in *Hygrade* was the constitutionality of the statutory measures—a subject we shall address in a limited

fashion later—the Supreme Court noted that the statutes in question

"expressly require that any representation that a product is kosher must not only be false but made with intent to defraud....

By engaging in the business of selling kosher products [the vendors] in effect assert an honest purpose to distinguish to the best of their judgment between what is and what is not kosher. The statutes require no more."

266 U.S. at 501–502, 45 S.Ct. at 142, 69 L.Ed. at 407.

We find the reasoning of the *Atlas* and *Hygrade* decisions persuasive as to both the purpose of kosher meat statutes and the requirement that a vendor must have an intent to defraud before he or she can be convicted. *See also People on Complaint of Schoen v. Bernstein,* 95 N.Y.S.2d 696, 699 (N.Y.C.Magis.Ct.1950), in which the presumption of criminality arising from possession of non-kosher food "was entirely destroyed by substantial evidence indicating mistake."

New York and Maryland are not the only states in which legislative bodies have passed laws governing the sale and advertising of kosher food. The City advises us that 22 states have adopted such provisions. For a compilation of cases discussing kosher food laws, see Annotation, *Validity and Construction of Regulations Dealing with Misrepresentation in the Sale of Kosher Food,* 52 A.L.R.3d 959 (1973).

In order to answer the certified question, we must next look to the state of mind required for a conviction under Art. 19, § 50. We believe that there are three potential states of mind that could constitute violations of Art. 19, § 50. They are:

1) That the vendor, with the intent to defraud, sells non-kosher food products representing them to be kosher, but the vendor knows that they are not kosher; or

2) That the vendor, with the intent to defraud, sells non-kosher food products representing them to be kosher, but the vendor believes they are probably not kosher; or

3) That the vendor, with the intent to defraud, sells non-kosher food products representing them to be kosher, but the vendor really does not know whether they are or are not kosher. "[A]n untrue representation has been 'knowingly' made if by one who knows it is untrue, believes it is untrue or is quite aware that he has not the slightest notion whether it is true or not." Rollin M. Perkins and Ronald N. Boyce, *Criminal Law* § 4, at 379 (3d ed. 1982). "[O]ne who states as a fact something which is actually contrary to fact, knowing that he does not know one way or the other whether it is true or false" ought to be guilty of false pretenses. 2 Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* § 8.7, at 400 (1986). See *Knickerbocker Merchandising Co. v. United States*, 13 F.2d 544 (2d Cir.), *cert. denied*, 273 U.S. 729, 47 S.Ct. 239, 71 L.Ed. 862 (1926), a mail fraud prosecution where Judge Learned Hand stated "it is not necessary to prove that the promisor intended not to perform; it is enough if he had no intention at all on the matter, or if he had no belief whether or not he could perform...." In *State v. Pickus*, 63 S.D. 209, 257 N.W. 284 (1934), the court said:

"[T]here appears to be little difference when a man makes a false representation for the purpose of inducing another to act for his benefit between the quality of conduct of the man who knows or believes his representation is false and that of the man who has neither knowledge nor belief concerning it, but nevertheless makes the representation, neither knowing nor caring whether it be true or false."

257 N.W. at 294.

Art. 19, § 50 was drafted to protect people from unscrupulous vendors who try to lure them into buying something less than what they are entitled to expect. Therefore, only vendors who wilfully embark on a course of commercial deceit by making untrue representations may run afoul of

its proscriptions,[2] and vendors who sincerely believe that their food products meet the kosher requirements would not violate the ordinance.

### The Second Question

Article 36 of the Maryland Declaration of Rights is headed "Religious freedom" and reads as follows:

"That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain, any place of worship, or any ministry; nor shall any person, otherwise competent, be deemed incompetent as a witness, or juror, on account of his religious belief, provided, he believes in the existence of God, and that under His dispensation such person will be held morally accountable for his acts, and be rewarded or punished therefor either in this world or in the world to come.

Nothing shall prohibit or require the making reference to belief in, reliance upon, or invoking the aid of God or a Supreme Being in any governmental or public document, proceeding, activity, ceremony, school, institution, or place.

Nothing in this article shall constitute an establishment of religion."

---

**2.** Some consumer protection statutes do not have a scienter requirement. *See, e.g.,* Md.Code (1975, 1990 Repl.Vol.), Commercial Law Art., § 13–301(1); *Golt v. Phillips,* 308 Md. 1, 10–11, 517 A.2d 328, 332–33 (1986).

Largely because of the diversity of beliefs held by those who made Maryland their home, religious liberty has been both championed and curtailed during this state's long history. Kenneth Lasson, *Free Exercise in the Free State: Maryland's Role in the Development of First Amendment Jurisprudence*, 18 U.Balt.L.Rev. 81 (1989). Pronouncements in Maryland favoring freedom to worship as one pleases predate the nation's Bill of Rights by more than a century. In 1649, the colonial assembly issued "An Act concerning Religion," now referred to as the Toleration Act, which proclaimed forbearance for everyone "professing to believe in Jesus Christ." Today we would find such a qualification unacceptable, but for its time the Toleration Act was progressive and broad-minded. A bill of rights scholar recently observed:

"Some colonies had a commitment to religious freedom. Maryland's Toleration Act of 1649 was far more liberal than England's Toleration Act of 40 years later and was the first to use the phrase, the 'free exercise' of religion, subsequently embodied in the First Amendment."

Leonard W. Levy, *Why We Have a Bill of Rights*, Constitution, Winter, 1991, at 12. The Act "gave Maryland a more liberal policy in matters of religion than any other colony in America at the time, excepting only Rhode Island and Pennsylvania." 1 Anson Phelps Stokes, *Church and State in the United States* 194 (1st ed. Harper & Brothers 1950) (hereinafter, Stokes). "Only in Maryland, was there true toleration and liberty of conscience." James McSherry, *History of Maryland* 51 (Bartlett B. James ed., The Baltimore Book Co.1904) (1850) (hereinafter McSherry). Religious tolerance found expression again in the Maryland Constitution, which was adopted in 1776, more than a decade before its federal counterpart.

■ To answer the second certified question, we must examine what is meant by the term "kosher." The ordinance at issue says that to comply with the law one "must adhere to and abide by the orthodox Hebrew religious rules

and regulations and the dietary laws." [3] Barghout complains that the word "kosher" is too vague to be enforced. He says that sellers, like himself, are at the mercy of individual inspectors licensed to apply personal standards on what is correctly kosher. We disagree. Inspectors are not given such latitude and they do not determine guilt. Though their interpretations of kosher rules have relevance in determining whether a particular vendor's products are kosher, what the vendor honestly believes is the primary subject of the inquiry. *See Greenwald v. Noyes,* 172 Misc. 780, 17 N.Y.S.2d 707, 708–09, (N.Y.Sup.Ct.1939); *Ran–Dav's v. State,* 243 N.J.Super. 232, 579 A.2d 316, 328 (App.Div.1990), *appeal pending,* (N.J. 19—), docket no. 32–525.

We do not believe that "kosher" is overly vague. Before discussing the meaning of "kosher," however, we observe that Barghout, himself, implied that he understood the term when he advertised that he sold "kosher" hot dogs. He also should realize that customers desiring "kosher" products would understand the term. The New Jersey court in *Ran–Dav's v. State* made a similar observation, when it said:

> "It is actually somewhat disingenuous for plaintiffs to say that "Kosher" is an indefinite term. They hold themselves out to the community as purveyors of "Kosher" food. They know that their many customers rely upon them and their supervising rabbi to be knowledgeable concerning the various requirements to designate their products as "Kosher" within the generally-accepted meaning of the word."

579 A.2d at 323. *See Hygrade Provision Co. v. Sherman,* 266 U.S. at 501–502, 45 S.Ct. at 142–43, 69 L.Ed. at 407.

---

**3.** The state law governing the sale of kosher products defines kosher as "prepared under and consisting of products sanctioned by the Code of Jewish Laws, namely in the Shulchan Aruch." Commercial Law Art., § 14–901(c)(1).

Kosher food, in and of itself, has no religious signifi-
cance. That certain foods are designated as "kosher" does
not signify or imply that they have received a special
blessing. Food that is "kosher" is merely food that is fit or
proper for consumption according to Jewish dietary laws.
It is the observance of the dietary laws themselves, as
opposed to the actual food product, which implicates Jewish
religious beliefs. "The Hebrew term is *kashrut,* which is
derived from the root כשר ('fit' or 'proper')." Kashrut is
"the collective term for the Jewish laws and customs per-
taining to the types of foods permitted for consumption and
their preparation." 6 *Encyclopedia Judaica* 27 (MacMillan
Publishing Company 1971). Factors that make particular
items fit for consumption under these dietary strictures can
be complex, but the overwhelming majority of these laws
are well settled and not subject to dispute. Those laws set
forth the rules of (1) permitted and forbidden animals, (2)
forbidden parts of otherwise permitted animals, (3) the
method of slaughtering and preparing permitted animals,
and (4) forbidden and permitted food mixtures and food
preparation. 8 *Encyclopedia of Religion* 270–71 (MacMil-
lan Publishing Co.1987). The *Encyclopedia Judaica* de-
votes several fine-print pages to discussing what foods are
or are not kosher and ways to prepare for eating those that
are. One reference work on religion observes that "[t]he
literature on *kashrut* is enormous, in both English and
Hebrew." 8 *The Encyclopedia of Religion* 273 (MacMillan
Publishing Company 1987). Particularly relevant to Bargh-
out's grilling methods is a chapter entitled "The relationship
of mixtures of permitted and forbidden food and the vessels
which have absorbed forbidden food ..." in a two-volume
work on Jewish food regulations. 1 Dayan Dr I. Grunfeld,
*The Jewish Dietary Laws* 140–149 (3d ed. The Soncino
Press 1982).

Complexity, however, must not be confused with vague-
ness. *See Governor v. Exxon Corp.,* 279 Md. 410, 454–55,
370 A.2d 1102, 1126 (1977), *aff'd,* 437 U.S. 117, 98 S.Ct.

2207, 57 L.Ed.2d 91 (1978). Using reference works such as the *Encyclopedia Judaica* can assist in that understanding.

"A statute is not vague when the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess a common and generally accepted meaning."

*Eanes v. State*, 318 Md. 436, 460, 569 A.2d 604, 615, *cert. denied*, —— U.S. ——, 110 S.Ct. 3218, 110 L.Ed.2d 665 (1990), quoting *Bowers v. State*, 283 Md. 115, 125, 389 A.2d 341, 347 (1978). The Supreme Court of the United States, in approving New York's Kosher Food Law, observed that "the term 'kosher' has a meaning well enough defined to enable one engaged in the trade to correctly apply it...." *Hygrade Provision Co. v. Sherman*, 266 U.S. at 502, 45 S.Ct. at 142, 69 L.Ed. at 407.

 Barghout protests that the ordinance in question favors the "Orthodox branch of Judaism." "Kosher" means fit according to Orthodox principles, not according to the standards of any other system of belief within Judaism. Since kosher is based on Orthodox Jewish standards, a statutory provision that food is properly labeled kosher only if it satisfies Orthodox Jewish standards does not create a denominational preference. *See Ran–Dav's v. State*, 579 A.2d at 320–21. By claiming the hot dogs he sells are kosher, Barghout implies that his hot dogs meet the Orthodox standards.

When people shop for kosher food, they want fare that is prepared under strict control according to Jewish dietary laws. But interest in kosher food is not limited to adherents of Judaism. Moslems can trust kosher food not to contain pork products, and people allergic to shellfish can be confident that they will avoid consuming those non-kosher creatures when they buy edibles that have passed muster with inspectors such as Rabbi Kurefeld.

In recent years, there has been an increase in the number of people who buy kosher products. Carolyn E. Mayer,

*Who's Keeping Kosher Now? Manufacturers Value Rabbis' Seal of Approval*, Washington Post, Sept. 27, 1989, at E1–E2. "[T]he bulk of kosher shoppers appear to be consumers who believe the kosher certification—designated by about 50 different symbols, depending on which rabbi or organization oversees the product—means higher quality food." *Id.* at E2, col. 1. Many members of the public "have a notion that the Kosher processes of meat preparation are under closer scrutiny than are those of the general producer, since they are supervised by State and federal health authorities as well as rabbinic personnel." *Ran-Dav's v. State*, 579 A.2d at 324. The court in *People v. Atlas* also commented favorably on the caliber of food prepared under such regulations: Kosher "meat is selected with great care, and especial cleanliness is observed in the slaughter thereof, from which a reasonable inference follows that it is of a superior quality." 170 N.Y.S. at 835.

When all these people—pious Jews, Moslems, individuals with health concerns, and quality-conscious shoppers—buy products designated "kosher," they trust that the food so described is up to the promise. It is reasonable to assume that generally they would not want a product contaminated with non-kosher sausage grease.

We conclude that nothing in Baltimore's kosher food ordinance inhibits the free exercise of religion guaranteed under Article 36 of the Maryland Declaration of Rights. Barghout is at liberty to practice whatever creed his conscience directs. His customers are similarly unfettered. As a New York court once observed when analyzing that state's law, "There is no invasion here of religious freedom or personal rights. The statute is directed against a form of fraud...." *People v. Goldberger*, 163 N.Y.S. 663, 666 (N.Y.Ct.Sp.Sess.1916). If anything, Baltimore's ordinance enhances freedom of religion by protecting individuals who wish to adhere to the Jewish dietary laws. *Id.* In construing a similar ordinance, one court noted, "Rather than to prohibit the free exercise of the religion, the ordinance serves to safeguard the observance of its tenets, and to

prohibit actions which improperly would interfere therewith." *Sossin Systems, Inc. v. Miami Beach,* 262 So.2d 28, 30 (Fla.Dist.Ct.App.1972).

While the liberty to worship as one's conscience directs is enshrined in Maryland's Declaration of Rights, Article 36 contains no proscription against governmental "establishment" of religion.[4] The second and third paragraphs of Article 36 [5] were added in 1970 by constitutional amendment as proposed in Senate Bill 496 and ratified by Maryland voters. Although the legislative files on Senate Bill 496 shed little light on the reasons behind the proposal,[6] Chapter 558 of the Acts of 1970 reveals that the amendment's purpose was to allow "religious readings or prayer and reference to a Supreme Being in certain instances." The following paragraph was originally proposed but dropped during the legislative session:

> "Nothing shall prohibit the offering, reading from, or listening to prayers or Biblical Scriptures, if participation therein is on a voluntary basis, in any governmental or public school, institution or place."

*Id.* The constitutional amendment was adopted substantially as originally introduced. It is apparent to us that Article 36 does not contain an establishment clause, which would prohibit government from setting up a church, giving pref-

---

4. For a discussion of Revolutionary era Maryland politics concerning religious freedom and the failure to prohibit government support of religion, see John Corbin Rainbolt, *The Struggle to Define "Religious Liberty" in Maryland, 1776–85,* 17 Journal of Church and State 443–458 (1975).

5. "Nothing shall prohibit or require the making reference to belief in, reliance upon, or invoking the aid of God or a Supreme Being in any governmental or public document, proceeding, activity, ceremony, school, institution, or place.
 Nothing in this article shall constitute an establishment of religion."

6. The file on Senate Bill 496 in the Department of Legislative Reference consists of two opinion letters from the State Attorney General on the constitutionality of the legislation. The analysis of each focuses on the issue of prayer in public schools or in public facilities.

erential treatment to any religion or coercing belief or disbelief in any religion.

We recognize that the establishment clause of the First Amendment is applicable to the states through the Fourteenth Amendment, *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), but the ultimate determination of whether the ordinance in question violates the establishment clause of the United States Constitution is for the federal courts.

We hold that Article 19, § 50 of the Baltimore City Code does not violate Article 36 of the Maryland Declaration of Rights.

CERTIFIED QUESTIONS ANSWERED AS SET FORTH ABOVE. APPELLANT TO PAY COSTS.