618 A.2d 735

**FERGUSON TRENCHING CO., INC.**

v.

**C. Stuart KIEHNE.**

**No. 51, Sept. Term, 1992.**

Court of Appeals of Maryland.

Jan. 20, 1993.

**170**

M. Evelyn Spurgin (Michael P. Darrow, both on brief), Annapolis, for appellant.

Louis P. Ruzzi (Whiteford, Taylor & Preston, all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, and ROBERT M. BELL, JJ.

CHASANOW, Judge.

In this case, we construe for the first time Maryland's construction trust statute, Maryland Code (1974, 1988 Repl. Vol., 1992 Cum.Supp.), Real Property Article, §§ 9–201 to 9–204.[1] At issue is the personal liability of a corporate general contractor's president for funds that the corporation held in trust for a subcontractor, but used for other purposes. The construction trust statute provides that a corporate officer of a contractor may be held personally liable when, with intent to defraud, the officer retains or uses the funds for a purpose other than the payment of those subcontractors for whom the funds were being held in trust.

I.

This case arises from a contract between appellant, Ferguson Trenching Co., Inc. (Ferguson), and Advanced Excavation Company, Inc. (Advanced), of which appellee, C.

---

1. Unless otherwise noted, all references to section numbers are to Maryland Code (1974, 1988 Repl.Vol., 1992 Cum.Supp), Real Property Article.

Stuart Kiehne (Kiehne), is the president. On August 16, 1989, Advanced entered into a $279,380 contract with Triple Brook Partnership to perform excavation work for Mount Oak Estates, a Triple Brook real estate development in Anne Arundel County. On September 15, 1989, Advanced executed a $44,549 contract with Ferguson which called for Ferguson to install a water line on the Mount Oak job. Ferguson completed its work and billed Advanced on February 5, 1990 for the contract price.

Advanced received only $251,000 in payments from Triple Brook towards its $279,380 Mount Oak contract. It paid out approximately $78,000 to subcontractors other than Ferguson and $82,000 in equipment costs for the project, and incurred approximately $46,000 in labor costs for its hourly employees on the project.[2] According to Advanced, the balance of about $45,000 was devoted to "the payment of debts incurred in connection with other construction projects and to Advanced's operating expenses." Three subcontractors or suppliers, including Ferguson, did not receive payment from Advanced for their work on the Mount Oak project.

Ferguson sought and obtained a judgment against Advanced for the amount due under the contract. In addition, Ferguson filed a complaint in the Circuit Court for Anne Arundel County alleging that Kiehne, Advanced's president, had violated Maryland's construction trust statute. Section 9–201(a) of the statute provides:

"(a) *Moneys to be held in trust.*—Any moneys paid under a contract by an owner to a contractor, or by the owner or contractor to a subcontractor for work done or materials furnished, or both, for or about a building by any subcontractor, shall be held in trust by the contractor or subcontractor, as trustee, for those subcontractors who did work or furnished materials, or both, for or

---

**2.** While there are minor discrepancies in the parties' versions of the Mount Oak job accounting, both parties generally agree as to the accounting we set forth.

about the building, for purposes of paying those subcontractors."

Section 9–202 of the statute provides:

"Any officer, director, or employee of any contractor or subcontractor, who, with intent to defraud, retains or uses the moneys held in trust under § 9–201 of this subtitle, or any part thereof, for any purpose other than to pay those subcontractors for whom the moneys are held in trust, shall be personally liable to any person damaged by the action."

With respect to establishing the requisite "intent to defraud" for purposes of imposing personal liability under § 9–202, § 9–203 provides that

"[t]he use by a contractor or subcontractor or any officer, director, or employee of a contractor or subcontractor of any moneys held in trust under § 9–201 of this subtitle, for any other purpose than to pay those subcontractors who did work or furnished materials, or both, for or about the building, shall be prima facie evidence of intent to defraud in a civil action."

In its complaint, Ferguson claimed that when Kiehne paid other debts of Advanced with money received for Ferguson's work, Kiehne became personally liable to Ferguson under §§ 9–202 and 9–203.

The case was tried before Judge Lawrence H. Rushworth, sitting without a jury. At trial, Kiehne testified that Advanced lost over $200,000 in 1989 and that he had gone so far as to consult with an attorney about a Chapter 11 bankruptcy filing. At the time Ferguson billed Advanced for its work on the Mount Oak job, Advanced was 90 to 150 days behind in payments to its creditors. In his Memorandum of Opinion and Order, the judge found that at the time Kiehne purchased Advanced in 1988, the business "was undergoing financial difficulties" which the court attributed to "earlier poor management and unseasonably wet weather." He also found that Advanced's problems "were made even more severe by the decline in the development industry from 1989 to the present period." He observed that

Kiehne had "placed large amounts, up to Sixty–Five Thousand Dollars ($65,000.00), of his own funds into the company in an attempt to keep the corporation solvent."

Noting that these facts are important "only as they go to the intent to defraud" which triggers personal liability under the statute, Judge Rushworth concluded that Ferguson had failed to make "a showing by a preponderance of the evidence of a clear intent to defraud" and entered judgment in Kiehne's favor.[3] Ferguson appealed to the Court of Special Appeals, and we granted certiorari before the intermediate appellate court could consider the case. Md.Code (1974, 1989 Repl.Vol., 1992 Cum.Supp.), Courts & Judicial Proceedings Art., §§ 12–201 & 12–203.

On appeal, Ferguson contends that the trial judge erred in two principal ways. First, Ferguson argues that the judge failed to recognize Kiehne's fiduciary duty to subcontractors such as itself, and therefore did not impose upon Kiehne the obligations that attend fiduciary status. Second, Ferguson argues that the trial judge improperly interpreted § 9–203 of the statute, which provides that use of trust moneys by a contractor's officer for a purpose other than payment of the subcontractors who worked on the job constitutes prima facie evidence of intent to defraud. We address each of these contentions.

## II.

The construction trust statute, titled "Trust Relationships in the Construction Industry," was enacted by Chapter 345 of the Acts of 1987 to protect subcontractors

---

**3.** Ferguson complains that the trial judge's opinion indicates that he confused the standard of proof by mixing the "preponderance of the evidence" and "clear and convincing evidence" standards. The correct standard for proof of fraud is "clear and convincing evidence." *Everett v. Baltimore Gas & Elec. Co.,* 307 Md. 286, 300, 513 A.2d 882, 889–90 (1986). Since the clear and convincing standard is more burdensome to the plaintiff than the preponderance of the evidence standard, any hint of the preponderance standard in the trial judge's opinion would only have worked to Ferguson's advantage. Thus, any error in the standard the judge applied was harmless.

from dishonest practices by general contractors and other subcontractors for whom they might work. To this end, it provides two distinct bases of liability. Section 9–201 creates a trust relationship between the contractor or subcontractor that has been paid by the owner and the subcontractor for whose work the owner has paid. Under § 9–201, upon receiving payment from the owner, the contractor or subcontractor holds the funds in trust for the benefit of the subcontractor that has performed work or provided materials for the project. Section 9–202 establishes the personal liability of officers, directors, or employees of contractors or subcontractors who fraudulently retain or use such trust moneys. The statute applies to both private and public construction projects, but not to contracts for the construction and sale of a single family residential dwelling, or to home improvement contracts by licensed home improvement contractors. § 9–204.

■ The personal liability provisions of the statute must be viewed in the context of basic corporate law. Officers and directors of a corporation generally are insulated from personal liability for the debts of the corporation. As we said in *Ace Dev. Co. v. Harrison*, 196 Md. 357, 366, 76 A.2d 566, 570 (1950), "when an official or agent signs a contract for his corporation it is simply a corporate act. It is not the personal act of the individual, and he is not personally liable for the corporate contract unless the matter is tainted by fraud...." *See also Bart Arconti & Sons, Inc. v. Ames–Ennis, Inc.*, 275 Md. 295, 312, 340 A.2d 225, 235 (1975) ("the corporate entity will be disregarded only when necessary to prevent fraud or to enforce a paramount equity").

As one author has observed, under common law rules litigants faced great difficulties in proving that corporate officers or directors committed fraud and noted that, prior to the statute's enactment

"an unscrupulous individual could establish a thinly capitalized construction company, use funds from a project to pay handsome salaries to the company's officers, and be fairly confident that the officers would not be personally

responsible for the debts of lower-tiered subcontractors and suppliers."

David F. Albright, *The Maryland Construction Trust Statute: New Personal Liability—Its Scope and Federal Bankruptcy Implications*, 17 U.Balt.L.Rev. 482, 484 (1988). In a letter to the chairman of the Senate committee considering the legislation, the president of the Maryland Society of the American Institute of Architects described the effect of a subcontractor's failure:

"[a] major subcontractor's financial failure precipitates a chain reaction due to the accumulation of unpaid monies to their subcontractors and suppliers that must be repaid by the Owners or General Contractor to free the project from mechanic liens.

"Virtually every major construction project sees a subcontractor fail financially. To the extent that retainage is inadequate to cover the unpaid subcontractors and suppliers of the failed subcontractor for work performed, the General Contractor or Owner must make up that difference. Usually the failed subcontractor simply reopens business under a new name and continues to plague our industry."

Letter from Phillip W. Worrall to the Hon. Walter M. Baker (Mar. 10, 1987) (in Legislative Bill file for S.B. 374, 1987 Term). By specifically providing for personal liability of officers, directors, and employees who intend to defraud subcontractors, and by providing that proof of a diversion of trust funds is prima facie evidence of intent to defraud, the statute makes recovery easier for subcontractors who fall victim to unscrupulous practices.

As originally drafted, Senate Bill 374 sought to impose both criminal and civil liability. It originally provided that any officer, director, or employee of the contractor or subcontractor who, with intent to defraud, retained or used the trust moneys for any purpose other than to pay the subcontractors would have been guilty of larceny and subject to a fine not to exceed $5,000 and imprisonment of not more than one year. S.B. 374, 1987 General Assembly of

Maryland, proposed § 9–116. The bill was subsequently amended to delete the criminal sanctions.

In the five years since its enactment, the statute has been reviewed only five times in reported opinions, each time by the federal bankruptcy court. *See In re Piercy,* 140 B.R. 108 (Bankr.D.Md.1992); *In re Marino,* 139 B.R. 380 (Bankr. D.Md.1992); *In re Parks,* 141 B.R. 92 (Bankr.D.Md.1991); *In re Holmes,* 117 B.R. 848 (Bankr.D.Md.1990); *In re Marino,* 115 B.R. 863 (Bankr.D.Md.1990). The instant case presents the first opportunity for a Maryland court to interpret the statute, and we now turn to that task.

### III.

 With respect to Ferguson's first argument, that Kiehne himself had a fiduciary duty to Ferguson, we need look only as far as the statute's plain language to see that Kiehne in fact had no such duty. "In construing a legislative enactment the fundamental judicial task is to determine and effectuate the legislature's intent, and indeed the very language of the statute serves as the primary source of the legislature's intent." *Scheve v. Shudder,* 328 Md. 363, 371–72, 614 A.2d 582, 586–87 (1992). Thus, when the language of a statute is clear and unambiguous, we need look no further to determine the legislature's intent. *Management Personnel Servs. v. Sandefur,* 300 Md. 332, 341, 478 A.2d 310, 341 (1984). In § 9–201, the statute creates a trust relationship between the contractor or subcontractor that has received payment from an owner and the subcontractor for whose performance the owner has paid. Nothing in the statute makes a corporate officer, director, or employee a fiduciary with respect to a party that has entered into a contract with the corporation.

Section 9–201, in fact, clearly states that moneys "shall be held in trust by the *contractor or subcontractor,* as trustee" for the subcontractors. (Emphasis added). Section 9–204(c), which supplies definitions for the statute, provides that "[i]n this subtitle, ... 'contractor,' and 'sub-

contractor' have the same meanings as in § 9–101 of this title." Section 9–101, in turn, provides that a "contractor" is "a person who has a contract with an owner," § 9–101(d), while a "subcontractor" is "a person who has a contract with anyone except the owner or his agent." § 9–101(g). Finally, § 1–101(j) of the Real Property Article, which provides definitions for use throughout the Article, defines "person" as including "any partnership, firm, association, public or private corporation, or any other entity." Thus, whatever the duties of a trustee or fiduciary may be, a question that is not before us today, these duties are imposed only on the party to the contract. In the case of a corporate party, these duties flow to the corporation, but not to its individual officers or directors.

Several of the federal bankruptcy cases referenced above have addressed this very question and reached the same conclusion. In *In re Marino*, 115 B.R. at 870, 872, for example, the court, Derby J., said:

"The instant Contractor was a corporation, of which Debtor was an officer. It was the Contractor that was the contracting party with the owner plaintiffs, and it was the Contractor on which the trust obligations were imposed literally.

\* \* \* \* \* \*

[Section 9–202] does not explicitly make corporate officers liable generally for application of trust funds. While § 9–202 places personal liability on an officer, it does so only when the officer diverts trust funds '... with intent to defraud, ....' It is not a general fiduciary liability for all purposes."

The liability of corporate officers under the Maryland statute can be contrasted with the liability of corporate officers under statutes from other states. Oklahoma's trust statute provides that "[i]f the party receiving any money under [the section imposing the trust] shall be a corporation, such corporation *and its managing officers* shall be liable for the proper application of such trust

funds...." Okla.Stat.Ann. tit. 42, § 153(3) (West 1990) (emphasis added); *see Carey Lumber Co. v. Bell,* 615 F.2d 370, 374–75 (5th Cir.1980) (finding that Oklahoma statute creates an express trust between materialmen and both the corporate contractor and its officers, imposing a fiduciary duty on corporate officers); *In re Marino,* 115 B.R. at 870–72 (contrasting two Maryland trust statutes with the Oklahoma law and finding that the Maryland statutes, unlike the Oklahoma law, did not directly impose liability on a corporate contractor's directors and officers). Similarly, the Texas construction trust fund statute provides that "[a] contractor, subcontractor, or *owner or* an *officer, director, or agent* of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds." Tex.Prop.Code Ann. § 162.002 (West 1984) (emphasis added); *cf. Nuclear Corp. of America v. Hale,* 355 F.Supp. 193, 197 (N.D.Tex.) (stating that under prior, but essentially similar, Texas construction trust fund statute, officers and directors of a corporate subcontractor were trustees of funds and were personally liable for funds spent in violation of that trust), *aff'd,* 479 F.2d 1045 (5th Cir.1973).

Had the contract been executed between Ferguson and Kiehne as an individual, then as a party to the contract Kiehne would indeed have become a trustee under § 9–201 and acquired fiduciary duties towards Ferguson. The instant contract, however, was between Ferguson and Advanced, and thus the trial judge was correct in imposing no fiduciary duty on Kiehne personally.

## IV.

Ferguson's second argument is that the trial judge misconstrued or misunderstood the personal liability provisions of the statute. The judge found that Ferguson had failed to prove Kiehne acted with "intent to defraud," and therefore decided Kiehne was not susceptible to personal liability under § 9–202. Ferguson contends that, under § 9–203, proof that the trust funds were diverted to a

purpose other than paying the subcontractors on the job is equivalent to conclusive proof of intent to defraud. Ferguson, however, misreads the statute. Section 9–203 provides that diversion of trust funds shall be only *"prima facie evidence* of intent to defraud...." (Emphasis added).

This Court considered the meaning of "prima facie evidence" in a number of cases addressing now-superseded §§ 140 and 142 of Article 27. Former § 140 of Article 27 defined and provided penalties for the crime of false pretenses. It provided:

"Any person who shall by any false pretense obtain from any other person any chattel, money or valuable security, with intent to defraud any person of the same, shall be guilty of a misdemeanor...."

Passed subsequent to and then coexisting with the false pretenses statute was the Maryland Worthless Check Act, codified at former § 142 of Article 27. It defined a particular type of false pretense, mainly the passing of bad checks and the unauthorized use of credit cards. It provided:

"Every person who, with intent to cheat and defraud another, shall obtain money, credit, goods, ... by means of a check, draft or any other negotiable instrument of any kind drawn ... shall be deemed to have obtained such money, credit, goods, ... by means of a false pretense.... The giving of the aforesaid worthless check, draft or negotiable instrument ... shall be *prima facie evidence of intent to cheat or defraud* [.]" (Emphasis added).

We considered the significance of the "prima facie evidence" language of § 142 which was absent from § 140, the general false pretenses statute. In *Willis v. State,* 205 Md. 118, 106 A.2d 85 (1954), we addressed the State's burden of proof under the Worthless Check Act. With respect to the prima facie evidence provision of § 142, we said that

"[i]t was obviously because of the difficulty so frequently encountered in proving fraudulent intent that the Legislature provided in the Worthless Check Act that the giving of a worthless check raises a *prima facie* presumption of

an intent to defraud. In a prosecution under this Act the burden is on the accused to show that he had no intent to defraud, and the presumption may be rebutted by proof of proper facts negativing a fraudulent intent."

*Id.* at 124–25, 106 A.2d at 88. Similarly, in *Waye v. State,* 231 Md. 510, 514, 191 A.2d 428, 430 (1963), we said:

"Thus it is seen that when the prosecution is under § 142, the mere giving of a worthless check under the circumstances named in the statute raises a presumption of an intent to cheat and defraud. However, if the State elects to proceed under § 140 where a worthless check is involved, it must do so without the aid of any presumption and affirmatively establish an intent by the defendant to cheat and defraud."

The effect of the "prima facie evidence" provision in § 142 was extremely significant in the outcome of prosecutions under both §§ 140 and 142. In *Flannigan v. State,* 232 Md. 13, 191 A.2d 591 (1963), the defendant was convicted under § 142 for having cashed a check which did not belong to him. On appeal, he argued that he could not be convicted under § 142 because " 'the element of intent to defraud [was] missing,' " *i.e.,* it had not been proved. *Id.* at 18, 191 A.2d at 593 (quoting the defendant's argument). We reviewed the statute and held that

"there was no attempt made [by the defendant] to combat the [prima facie evidence] presumption. As soon as the State proved that the defendant cashed the check and it had been dishonored, ... the presumption arose. The defense offered no witnesses, and made no effort in cross-examining those presented by the State to offset the effect of the presumption. The evidence produced not only permitted, but impelled, a finding of guilt...."

*Id.* If in *Flannigan* the presence of the prima facie evidence provision in § 142 worked to the defendant's detriment, then in *Willis v. State* its absence from § 140 worked to the defendant's benefit. In *Willis,* the State had charged the defendant with a violation of § 140, the general false pretenses statute, and not § 142. The Court pointed out

that "[s]ince the indictment in this case charged a violation of the original False Pretense Act [§ 140], not the Worthless Check Act [§ 142], the State had the burden of proving that [the] defendant was motivated by a fraudulent intent," without the evidentiary boost provided by the prima facie evidence provision appearing only in § 142. *Willis*, 205 Md. at 127, 106 A.2d at 89. In *Willis*, the Court concluded that "the State failed to produce evidence to support the charge that defendant [acted] with intent to defraud," and reversed the § 140 conviction. *Id.* at 128–29, 106 A.2d at 90.

In making this analogy to our old theft statutes, we recognize that the precise meaning of "prima facie evidence" is the subject of considerable disagreement. Two competing views exist, described by one commentator as follows:

> "The term 'prima facie evidence' is sometimes used to mean 'compelling evidence,' *i.e.*, evidence which shifts the burden of production to the opposing party, and thus to signify a true evidentiary rebuttable presumption. It is also used to mean 'sufficient evidence' to get to the jury, *i.e.*, merely that the party with the burden of persuasion has met the burden of production and created an issue for the trier of fact by giving rise to a permissible inference." (Footnotes omitted).

Lynn McLain, *Maryland Evidence* § 301.4, at 230–31 (1987); *see also Grier v. Rosenberg*, 213 Md. 248, 252–55, 131 A.2d 737, 739–40 (1957). We can decide the issue in this case without becoming entangled in the law of presumptions, which we have previously characterized as " 'the slipperiest member of the family of legal terms, except its first cousin, "burden of proof." ' " *Ristaino v. Flannery*, 317 Md. 452, 456, 564 A.2d 790, 792 (1989) (quoting E. Cleary, *McCormick on Evidence* § 342, at 965 (3d ed. 1984)). We need not choose between the two competing approaches in order to reject the approach that Ferguson urges upon us. Ferguson's argument that proof of diversion of trust funds *equals* proof of intent to defraud would give "prima facie evidence" the effect of an *irrebuttable*, or

conclusive, presumption—one which the defendant could not refute at all. Ferguson provides no authority for such an approach, and we can find none.

■ In the absence of legal authority, Ferguson argues that, logically, the "prima facie evidence" language in § 9–203 of the construction trust statute must equate to conclusive proof. Because a corporate officer's personal liability for corporate debts could have been premised, even pre-statute, on fraudulent conduct, *see Bart Arconti*, 275 Md. at 312, 340 A.2d at 235; *Ace Dev. Corp.*, 196 Md. at 366, 76 A.2d at 570, Ferguson contends that anything but its interpretation of the statute does no more than restate the general rule of officer liability. We disagree, because we think it is clear that the statute enhances the personal liability of corporate officers and directors in a very important way. Under the statute, proof of the diversion of funds allows a plaintiff's case to reach the fact finder without the plaintiff otherwise having to prove the defendant's intent to defraud. This is especially significant in light of the fact that the requirement of intent to defraud may be difficult to prove. Contrary to Ferguson's contentions, our interpretation of § 9–203 does not simply restate the pre-statute rule. While it does not create an irrebuttable presumption of intent to defraud, § 9–203 nonetheless provides the plaintiff subcontractor an important evidentiary boost towards establishing the defendant's intent to defraud. In this respect, it significantly alters the pre-statute personal liability of corporate officers.

## V.

From the conclusion that proof of a diversion of funds does not provide an irrebuttable presumption of intent to defraud, it follows that a defendant may introduce evidence to convince the trier of fact that he or she did *not* act with intent to defraud. Perhaps surprisingly, the term "intent to defraud" has not been clearly or uniformly defined in this state, despite the fact that "intent to defraud" and its analogue, "fraudulent intent," are elements of many acts

proscribed by statute in Maryland. *See, e.g.,* Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 9 (insurance fraud), § 44(b) (counterfeiting and forgery of instruments), § 132 (fraudulent misappropriation of trust property or money by fiduciaries), § 145(c)-(e) (credit card offenses), § 173 (conversion of partnership money), § 193 (tampering with gas meter); Md. Code (1982, 1990 Repl.Vol.), Health–General Art., §§ 21–217(b)(7) & 21–258(b)(4) (misbranded drugs or devices); Md. Code (1977, 1992 Repl.Vol.), Transportation Art., § 14–110 (falsification of documents or plates), §§ 18–104 & 22–415(3)–(4) (sale or operation of vehicles with disconnected or altered odometers); Md.Code (1992), Business Regulation Art., § 1–415 (fraudulent use of business or trade name); Md.Code (1975, 1990 Repl.Vol.), Commercial Law Art., § 14–1403 (unlawful possession of credit card number), § 15–207 (fraudulent conveyances), §§ 18–201 to 18–207 (fraudulent issuance and negotiation of bills of lading), §§ 18–303 & 18–306 (fraudulent issuance and negotiation of warehouse receipts).

We recently considered the meaning of "intent to defraud" in the context of a Baltimore City Code provision forbidding the representation, with intent to defraud, of non-kosher food as kosher. *Barghout v. Mayor,* 325 Md. 311, 600 A.2d 841 (1992). We concluded that "only vendors who wilfully embark on a course of commercial deceit by making untrue representations may run afoul of its [the ordinance's] proscriptions, and vendors who sincerely believe that their food products meet the kosher requirements would not violate the ordinance." *Id.* at 321, 600 A.2d at 845 (footnote omitted).

■ Underlying an "intent to defraud" is some form of bad faith by the defendant. In order to have an intent to defraud, the defendant must act dishonestly or at least with reckless indifference. *See Everett v. Baltimore Gas & Elec.,* 307 Md. 286, 300, 513 A.2d 882, 889 (1986) (stating that an element of fraud is knowledge or "such reckless indifference ... as to impute knowledge to the party."). In a recent products liability case, we discussed "intent to

defraud" and concluded, for the purpose of determining whether punitive damages were available, that the products liability equivalent of "intent to defraud" is "actual knowledge of the defect and deliberate disregard of the consequences," *Owens–Illinois v. Zenobia,* 325 Md. 420, 462, 601 A.2d 633, 653, *reconsideration denied,* 325 Md. 665, 602 A.2d 1182 (1992), a standard that "requires a *bad faith* decision by the defendant to market a product...." *Id.* at 463, 601 A.2d at 653 (emphasis added). We also stated:

> "Actual knowledge [for intent to defraud], however, does include the wilful refusal to know. *See, e.g., State v. McCallum,* 321 Md. 451, 458–461, 583 A.2d 250, 253–255 (1991) (Chasanow, J., concurring) (" '[K]nowledge' exists where a person believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth.")."

*Id.* at 462 n. 23, 601 A.2d 654 n. 23. Other Maryland cases addressing an intent to defraud bear out this characterization. In *Roderick v. State,* 9 Md.App. 120, 262 A.2d 783 (1970), for example, the defendant was convicted of larceny after trust upon failing to return, after being suspended from duty, items of personal property issued to him by the State Police for his use as a state trooper. The Court of Special Appeals concluded that the State had failed to prove "that the defendant's failure to return the items ... was accompanied by a specific intent to fraudulently convert them to his own use as required by the statute." *Id.* at 125, 262 A.2d at 786. The State proved only a failure to return the items, and its own witnesses testified that the defendant first advised them he intended to return the items, and then that he could not return them because they had become lost. Further, there was uncontradicted evidence that the defendant had offered to reimburse the State for the missing items and that he had returned the "great bulk" of the property issued to him. *Id.* at 126, 262 A.2d at 786. The court noted the absence of any "presumption of law" and held that "[t]he mere failure to return the missing items

will not, without more, support a finding of fraudulent conversion ...," and it reversed the conviction. *Id.*

Our characterization of "intent to defraud" as requiring dishonesty or bad faith by the defendant is supported by federal cases holding that the defendant's good faith is a defense to a federal charge whose elements include an intent to defraud. A summary of this defense is found in *United States v. Ammons*, 464 F.2d 414, 417 (8th Cir.), *cert. denied*, 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 253 (1972), where the court approved of the following jury instruction:

> " 'Fraudulent intent is one of the essential elements of the offenses with which the defendants are charged.... Bad faith is an essential element of fraudulent intent. Good faith constitutes a complete defense to one charged with an offense of which fraudulent intent is an essential element. One who acts with honest intention is not chargeable with fraudulent intent. One who expresses an opinion honestly held by him, or a belief honestly entertained by him, is not chargeable with fraudulent intent even though such opinion is erroneous and such belief is a mistaken belief. Evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent.' "

*Id.* (quoting trial court's instruction); *see also United States v. Williams*, 728 F.2d 1402, 1404 (11th Cir.1984) ("Good faith is a complete defense to the element of intent to defraud.").

■ Applying these principles to the facts of the instant case, we must first note that when an action has been tried without a jury, we review the case on both the law and the evidence. Maryland Rule 8–131(c). We do not set aside the judgment of the trial court on the evidence, however, unless it is clearly erroneous. *Id.* In this case, the judge below concluded that, despite the fact that Ferguson proved that Kiehne diverted trust funds, it failed to prove that Kiehne did so with the intent to defraud. Reviewing the law, as we have done, and the evidence, as we now do, we cannot say

that the trial judge was clearly erroneous when he found for Kiehne.

From the evidence offered at trial, the trial court could have found the following facts, which individually or collectively might negate an intent to defraud by Kiehne: (1) all contract funds were devoted to legitimate business debts and expenses of Advanced; (2) Advanced was undergoing severe financial hardship throughout Kiehne's ownership of the company, and before he took it over; (3) Advanced was from 90 to 120 days behind on its payments to creditors; (4) Advanced suffered a net loss of over $200,000 in 1989; (5) Kiehne consulted with an attorney about a possible Chapter 11 bankruptcy filing; (6) an amount nearly equal to the amount Advanced owed Ferguson was still owed to Advanced by the owners of the Mount Oak project; (7) Kiehne invested a large amount of his own money, perhaps as much as $65,000, to keep Advanced in business; (8) Kiehne fully intended to pay Ferguson's invoice, but Advanced's cash collections fell short of projections.

In sum, the trial judge could have found that Kiehne genuinely believed Advanced would be able to pay Ferguson what it was owed within a reasonable time, out of Advanced's anticipated future income. Such a finding could be sufficient to negate the prima facie presumption that Kiehne acted with the intent to defraud under the standards we have enunciated above. Kiehne may have, in the words of the Eighth Circuit's *Ammons,* made a "mistake in judgment or an error in management." *Ammons,* 464 F.2d at 471. He may even have been "careless." *Id.* This does not necessarily mean, however, that he acted fraudulently when he used the trust moneys for other purposes. We cannot say the trial judge erred in finding that Ferguson failed to prove Kiehne's intent to defraud, and we therefore affirm the judgment of the trial court in Kiehne's favor.

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.